No. 16-2243

# In the United States Court of Appeals for the Fourth Circuit

———————————————

DAVID M. DAUGHERTY,
*Plaintiff-Appellee,*

v.

OCWEN LOAN SERVICING, LLC,
*Defendant-Appellant,*

and

EQUIFAX INFORMATION SERVICES, LLC,
*Defendant.*

———————————————

On Appeal from the United States District Court
for the Southern District of West Virginia

———————————————

## PLAINTIFF-APPELLEE'S BRIEF

———————————————

Deepak Gupta
Matthew W.H. Wessler
Rachel S. Bloomekatz
GUPTA WESSLER PLLC
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741
*deepak@guptawessler.com*

Jed R. Nolan
Ralph C. Young
HAMILTON, BURGESS, YOUNG &
POLLARD, PLLC
P.O. Box 959
Fayetteville, WV 25840
(304) 574-2727
*jnolan@hamiltonburgess.com*

*Counsel for Plaintiff-Appellee*

# TABLE OF CONTENTS

Table of authorities ................................................................................. iii

Introduction ......................................................................................... 1

Statement of the Issues ......................................................................... 4

Statement of the Case ........................................................................... 5

    A.   Statutory Background ................................................................. 5

    B.   Statement of Facts ..................................................................... 6

         1.    Within a month, Ocwen receives multiple notices
             disputing the accuracy of the tradeline ....................... 7

         2.    Ocwen continues to receive additional dispute notices for
             more than a year... ...................................................... 9

         3.    As Daugherty's mortgage payment nears, Ocwen
             continues to ignore the credit inaccuracies. ........................... 10

         4.    Daugherty submits his dispute to the Consumer Financial
             Protection Bureau**.** ................................................... 13

         5.    Ocwen continues to verify inaccurate information in
             August 2014.. ............................................................. 14

    C.   Procedural History .................................................................. 15

         1.    The district court rejected Ocwen's contention that it was
             entitled judgment as a matter of law on willfulness. ................ 17

         2.    The district court permitted Daugherty to admit Equifax
             ACDVs because Ocwen failed to produce
             its ACDVs. .................................................................. 19

         3.    The district court excluded irrelevant evidence regarding
             Aggressive Credit Repair. ........................................... 20

         4.    The district court allowed Daugherty's expert to testify as
             to the customary standards in the industry. ...................... 21

          5.    The district court admitted publicly available SEC filings
             during the punitive damages phase of the trial. ...................... 23

          6.    The district court affirmed the jury's conclusion that
             Ocwen's reprehensible conduct merited the significant
             punitive damages award. ............................................ 25

Summary of Argument ........................................................................ 26

Standard of Review .................................................................. 28

Argument .................................................................................. 30

    I.    The issue of willfulness was properly presented to the jury. .................. 30

        A.    To obtain summary judgment on the question of willfulness, Ocwen had the burden to show that its actions were objectively reasonable as a matter of law. ........................ 30

        B.    The district court correctly concluded that disputes of material fact precluded judgment as a matter of law as to whether Ocwen's investigations were reasonable. .................... 33

            1.    Under the FCRA's text and binding circuit precedent, Ocwen was required to conduct a reasonable investigation based on all information available about the nature of the dispute. ..................................... 34

            2.    There was overwhelming evidence from which the jury could (and indeed did) conclude that Ocwen acted recklessly. ............................................... 39

    II.    The district court properly addressed evidentiary issues. ...................... 40

        A.    Equifax documents were properly admitted. ............................. 42

        B.    Evan Hendricks's testimony was properly admitted. ................. 44

        C.    The district court properly excluded irrelevant evidence regarding a credit repair company. ............................................ 46

        D.    The district court did not err in admitting the financial documents of Ocwen's parent company. ................................... 46

    III.    Ocwen is not entitled to remittitur. ....................................... 51

        A.    Ocwen was Reprehensible. ....................................................... 52

        B.    The punitive damage award must stand to punish and deter Ocwen. .......................................................................... 52

Conclusion ................................................................................ 56

# TABLE OF AUTHORITIES

## Cases

*Abner v. Kansas City Southern Railroad,*
513 F.3d 154 (5th Cir. 2008) ............................................................ 55

*Bach v. First Union National Bank,*
486 F.3d 150 (6th Cir. 2007) ............................................................ 51

*Bank of Montreal v. Signet Bank,*
193 F.3d 818 (4th Cir. 1999). ........................................................... 28

*BMW of North America, Inc. v. Gore,*
517 U.S. 559 (1996) .......................................................... 24, 50, 51, 54

*Boyd v. Wells Fargo Banks, N.A.,*
No. 2:15-CV-2, 2016 WL 7323293 (S.D. Ga. Dec. 14, 2016) ...................... 37

*Bristol Steel & Iron Works v. Bethlehem Steel Corp.,*
41 F.3d 182 (4th Cir. 1994) ........................................................... 28, 41

*Chiang v. Verizon New England, Inc.,*
595 F.3d 26 (1st Cir. 2010) .............................................................. 34

*Creekmore v. Maryview Hospital,*
662 F.3d 686 (4th Cir. 2011) ............................................................ 43

*Cummings v. Connell,*
402 F.3d 936 (9th Cir. 2005) ............................................................ 55

*Dalton v. Capital Associated Industries, Inc.,*
257 F.3d 409 (4th Cir. 2001) ............................................................. 5

*Farmer v. Brennan,*
511 U.S. 825 (1994) .................................................................... 29, 30

*Farren v. RJM Acquisition Funding, LLC,*
2005 WL 1799413 (E.D. Pa. July 26, 2005) .......................................... 37

*Fuges v. Southwest Financial Services,*
707 F.3d 241 (3d Cir. 2012) ............................................................. 30

*Gorman v. Wolpoff & Abramson, LLP,*
584 F.3d 1147 (9th Cir. 2009). ..................................................... 34, 37

*Hinkle v. Midland Credit Management, Inc.,*
827 F.3d 1295 (11th Cir. 2016) .................................................... 37, 38

*JCB, Inc. v. Union Planters Bank, NA*,
    539 F.3d 862 (8th Cir. 2008) ............................................................ 55

*Johnson v. MBNA America Bank, NA*,
    357 F.3d 426 (4th Cir. 2004) ....................................................*passim*

*Kemp v. American Telephone & Telegraph Co.*,
    393 F.3d 1354 (11th Cir. 2004) ...................................................... 55

*Laing v. Federal Express Corp.*,
    703 F.3d 713 (4th Cir.2013) ........................................................... 28

*Lee v. Edwards*,
    101 F.3d 805 (2d Cir. 1996)............................................................ 55

*McDonald v. OneWest Bank, FSB*,
    2013 WL 858197 (W.D. Wash. 2013) ............................................ 35

*Myrick v. Prime Insurance Syndicate, Inc.*,
    395 F.3d 485 (4th Cir. 2005) ......................................................... 28

*Ray Communications, Inc. v. Clear Channel Communications, Inc.*,
    673 F.3d 294 (4th Cir. 2012) ......................................................... 28

*Rogers v. JPMorgan Chase Bank, N.A.*,
    2012 WL 2190900 (W.D. Wash. 2012) .......................................... 35

*Safeco Insurance Co. of America v. Burr*,
    551 U.S. 47 (2007) ......................................................................*passim*

*Saunders v. Branch Banking And Trust Co. Of VA*,
    526 F.3d 142 (4th Cir. 2008) ....................................................*passim*

*Saunders v. Equifax Information Services, L.L.C.*,
    2006 WL 2850647 (E.D. Va. Oct. 3, 2006) ................................... 35

*Schultz v. Butcher*,
    24 F.3d 626 (4th Cir. 1994) ........................................................... 49

*SimmsParris v. Countrywide Financial Corp.*,
    652 F.3d 355 (3d Cir. 2011) ........................................................... 34

*St. Louis, Iron Mountain & Southern Railway Co. v. Williams*,
    251 U.S. 63 (1919) ......................................................................... 54

*State Farm Mutual Automobile Ins. Co. v. Campbell*,
    538 U.S. 408 (2003) ..........................................................51, 52, 54

*Tools USA & Equipment Co. v. Champ Frame Straightening Equipment Inc.*,
    87 F.3d 654 (4th Cir. 1996). ............................................................. 28

*TXO Production Corp. v. Alliance Resources Corp.*,
    419 S.E.2d 870 (1992)...................................................................... 48

*TXO Production Corp. v. Alliance Resources Corp.*,
    509 U.S. 443 (1993) ................................................................... 48, 50

*U.S. v. Williams*,
    674 F.2d 310 (4th Cir. 1982) ......................................................... 28

*Watson v. Citi Corp.*,
    2008 WL 4186317 (S.D. Ohio 2008) ............................................. 35

*Westra v. Credit Control of Pinellas*,
    409 F.3d 825 (7th Cir. 2005) ............................................ 36, 37, 38

*Williams v. First Advantage LNS Screening Solutions, Inc.*,
    No. 1:13CV222-MW/GRJ, 2017 WL 819486 (N.D. Fla. Mar. 2, 2017)........ 52

*Yohay v. City of Alexandria Employees Credit Union, Inc.*,
    827 F.2d 967 (4th Cir. 1987) ......................................................... 50

**Statutes**

15 U.S.C. § 1681i(a)(2)..............................................................6, 37

15 U.S.C. § 1681s-2(b) ........................................................*passim*

15 U.S.C. § 1681o.......................................................................6

15 U.S.C. § 1681n..................................................................6, 30

**Rules**

Federal Rules of Evidence Rule 401......................................... 23

Federal Rules of Evidence Rule 403......................................... 23

Federal Rules of Civil Procedure Rule 50(a) ......................... 27

Federal Rules of Civil Procedure Rule 50(b) .................... 16, 27

Federal Rules of Civil Procedure Rule 59 ...................16, 28, 41

Federal Rules of Civil Procedure Rule 60(b) .............16, 28, 49

Federal Rules of Civil Procedure Rule 26 .......................19, 41

**Other authorities**

115 Cong. Rec. 2,412 (1969) ............................................................... 5, 38

Fed. Bank. L. Rep. P 153-505 (C.C.H.), 2014 WL 10539310 (Dec. 10, 2014)........ 7

## INTRODUCTION

For more than a year, David Daugherty repeatedly and diligently sought to fix what everyone agrees were glaring inaccuracies on his credit report. Anticipating a large "balloon" payment that would soon be due on his home mortgage with Ocwen Loan Servicing, Daugherty sought to refinance his loan. But refinancing proved impossible because Daugherty's Equifax credit report falsely stated that he was over $6,000 in arrears on his Ocwen mortgage, was five months past due, and was facing foreclosure proceedings. None of those things was true.

So Daugherty did what any responsible consumer would do. He contacted Ocwen directly, multiple times, asking it to fix the inaccuracies. That didn't work. Equifax was also contacted dozens of times about the inaccurate information, and Equifax in turn communicated the complaints to Ocwen. But Ocwen failed to conduct a reasonable investigation. After taking only superficial steps to confirm that Daugherty held the loan, Ocwen verified the rest of the contested information about amounts past due and foreclosure proceedings. Daugherty even initiated complaints with officials at the federal Consumer Financial Protection Bureau—to no avail. After over a year of complaints, Ocwen was still confirming reports falsely stating that Daugherty was in arrears and in foreclosure.

The Fair Credit Reporting Act protects homeowners like Daugherty from this precise problem of inaccurate credit information. Specifically, the Act expressly

1

requires "furnishers" of credit information, like Ocwen, to conduct a reasonable investigation when a consumer disputes the credit information with a credit reporting agency, like Equifax, and to correct any inaccuracies. 15 U.S.C. § 1681s-2(b)(1)(A); *Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 431 (4th Cir. 2004). For "willful" violations, the FCRA allows recovery of not only actual damages, but also statutory and punitive damages. After reviewing the evidence of Ocwen's complete failure to abide by its responsibilities under the FCRA, a jury found that Ocwen not only violated the FCRA—but did so willfully. And, in light of Ocwen's reprehensible conduct, the jury awarded punitive damages.

Attempting to deflect attention from its own conduct, Ocwen's brief (at 4-6) tells a story about a "one-sided" district court that "failed its duty as a gatekeeper" and made repeated evidentiary decisions against Ocwen. But the district court, after carefully reviewing the evidence and relevant legal authority, properly let the jury do the deciding. As in many civil cases—from garden-variety tort cases to Eighth Amendment deliberate-indifference cases—district courts must apply an objective standard to assess whether the defendant's conduct was reasonable, and determine whether to send that question to the jury. So too, here: the measure for willfulness under the FCRA encompasses an "an objective standard: action entailing 'an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68 (2007).

2

As in many other civil cases applying an objective standard, when there are genuine issues of material fact that prevent the court from reaching that question as a matter of law, it goes to the jury. And that is exactly what the district court concluded here. It found that "genuine issue of material fact as to whether Ocwen conducted a reasonable investigation of [Daugherty's] disputes" precluded summary judgment because "there is sufficient evidence here, should the jury decide to accept it, to support a finding of willfulness." [JA 1421, 3093-3094] There is no legitimate basis for this Court to take that question away from the jury.

Nor are there legitimate grounds to overturn the jury's decision to award punitive damages given its well-supported finding that Ocwen's actions were highly reprehensible. Though Ocwen would prefer that all punitive damages be limited to a 1:9 ratio, that is not the law. The Supreme Court and this Court have long recognized that greater ratios may comport with due process when reprehensible conduct results in minimal compensatory damages. That is especially so where, as here, Congress has specifically authorized punitive damages for violations of the FCRA, hoping to deter future violations. *See Saunders v. Branch Banking and Trust Co.*, 526 F.3d 142, 152 (4th Cir. 2008) (upholding punitive damages with 1:80 ratio in FCRA case). The district court's decision should be upheld.

# STATEMENT OF THE ISSUES

**1. *Willfulness*.** Did the district court correctly allow the jury to consider whether Ocwen's conduct was willful under the FCRA because there were disputed issues of material fact concerning the reasonableness of Ocwen's investigation?

**2. *Evidentiary issues*.** Did the district court correctly (1) admit evidence that Daugherty obtained from Equifax and that contained the exact same content as evidence Ocwen possessed yet failed to produce; (2) admit expert testimony on topics disclosed in the expert's report that did not constitute legal conclusions; and (3) exclude as irrelevant evidence that Ocwen did not have during its investigation and thus had no bearing on whether its investigation was reasonable?

**3. *Financial information*.** Did the district court correctly admit publicly available financial information from Ocwen Financial Corporation (the parent company and sole shareholder) when Ocwen (1) refused to produce any financial information in discovery; (2) failed to make its corporate representative available to testify to Ocwen's assets despite being informed that Daugherty intended to recall her during the bifurcated punitive-damages portion of trial and the district court had not excused her from trial; and (3) relied upon the information to argue that Ocwen was financially unable to pay a large punitive damage award?

4

**4. *Punitive damages*.** Did the district court correctly uphold the jury's punitive damages award because, under the factors adopted by the Supreme Court and the Fourth Circuit, Ocwen's repeated, willful conduct reflected a high degree of reprehensibility?

## STATEMENT OF THE CASE

### A.    Statutory Background

"Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414 (4th Cir. 2001). In "too many instances," Congress found, consumer-reporting agencies "were reporting inaccurate information," often without consumers' knowledge. *Id.* And even if consumers learned of an error, they often had "difficulty in correcting inaccurate information." 115 Cong. Rec. 2,412 (1969). The results of inaccurate information for a consumer's credit score can be debilitating—thwarting a consumer's ability to get a loan, rent an apartment, or do any number of everyday activities impacted by one's credit rating.

With the FCRA, Congress sought to change that. The statute placed particular responsibilities on "furnishers of information"—*i.e.,* creditors or their servicers, like Ocwen—to ensure the accuracy of a consumer's debt-related information that they provide or that is reported by a credit reporting agency ("CRA"), like Equifax. *See* 15 U.S.C. § 1681s-2. Specifically, section 1681s-2

imposes on furnishers an initial duty to provide credit reporting agencies with accurate information about its consumers. *Id.* Moreover, after receiving notice that a customer disputes information on his or her credit report from a CRA, the furnisher *must* conduct a reasonable investigation and correct any inaccurate information. *Johnson*, 357 F.3d at 431. Section 1681s-2(b) expressly requires "furnishers" like Ocwen to:

> (A) conduct an investigation with respect to the disputed information;
> (B) review all relevant information provided by the [CRA] pursuant to 1681i(a)(2) of this title;
> (C) report the results of the investigation to the [CRA];…[and]
> (D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other [CRAs].

15 U.S.C. § 1681s-2(b)(1). Accordingly, after receiving notice from Equifax that information has been disputed, Ocwen must review the information provided by Equifax and conduct a reasonable investigation as to the accuracy and completeness of the relevant information.

Like other disclosure statutes, the FCRA enforces its provisions by creating a private right of action with a two-tier damages scheme. "If a violation is negligent, the affected consumer is entitled to actual damages. If willful, however, the consumer may have actual damages, or statutory damages ranging from $100 to $1,000, and even punitive damages." *Safeco*, 551 U.S. at 53; *see also* 15 U.S.C. §§ 1681o, 1681n.

**B.      Statement of Facts**

This case began because David Daugherty sought to refinance a home mortgage loan he had that was serviced by Ocwen Loan Servicing, LLC. His loan had an approaching $80,000 "balloon payment," due in July 2014. [JA 728; 730-33] In March 2013, well before the payment was due, Daugherty reviewed his credit report from Equifax and discovered that it contained an inaccurate "tradeline" concerning his Ocwen-serviced loan.[1] Though Daugherty was unaware, the Equifax report contained two tradelines—one accurately stating that he was not in arrears or in foreclosure and one inaccurately stating that his Ocwen loan was 120 days past due and that he was in foreclosure. [JA 757-58; 1409]

**1. *Within a month, Ocwen receives multiple notices disputing the accuracy of the tradeline.*** Once Daugherty discovered the inaccurate tradeline, he lodged an initial dispute—on March 14, 2013—by faxing a letter to Ocwen. That letter specifically informed Ocwen that the Equifax credit report was wrong because it "states that I am currently behind $6,128.00 dollars with Ocwen Loan Services and that I am in foreclosure." [JA 836] Daugherty insisted that Ocwen "Please correct those records as soon as possible." [*Id.*]

---

[1] Tradelines are entries on a consumer's credit report that "describe[] the consumer's account status and activity" for credit (i.e., a loan line of credit, or credit card) that has been extended to that consumer. They typically include the name of the lender, the parties responsible for paying the loan, and the payment status of the account. *See* Fed. Bank. L. Rep. P 153-505 (C.C.H.), 2014 WL 10539310, fn 1.

7

Ocwen ignored the request. Instead, it responded with a letter from its research department addressing a different tradeline from a year earlier. [JA 835] And, although the letter went on to confirm that Daugherty's loan was current and not in foreclosure, Ocwen did nothing to rectify the inaccurate March 2013 tradeline. [*Id.*]

Daugherty next registered a complaint with Equifax. This complaint was then passed on to Ocwen via the "e-Oscar system"—a web-based, automated portal that the CRAs run in order to create a record of the consumer's dispute and send it electronically to the furnisher in a form called the Automated Credit Dispute Verification ('ACDV'). The furnisher then responds through the e-Oscar system on the exact same ACDV. [JA 1408] For every ACDV, "a code is assigned to the dispute describing the nature of the dispute," and the servicer must investigate the dispute and respond via the same ACDV with a verification or any modifications or corrections. [JA 863]

Less than a week after receiving Daugherty's initial notice of the tradeline error, Ocwen also received the Equifax ACDV. The ACDV reported that the tradeline showed Daugherty $6,128 and 120 days past due and that foreclosure proceedings had started. [JA 1092] Equifax included two dispute codes: (1) code 001—"Not His/Hers"; and (2) code 007—"Disputes present/previous Account Status/Payment History Profile/Payment Rating. Verify Payment History Profile,

Account Status, and Payment Rating."[2] [*Id.*] Having received this ACDV, Ocwen was then obligated under the FCRA to conduct a reasonable investigation of the dispute. *See* 15 U.S.C. § 1681s-2(b)(1). Yet Ocwen disregarded this requirement; it simply verified the inaccurate tradeline showing that Daugherty was past due and in foreclosure. [JA 1162-63]

Ocwen's own "contemporaneous" internal documents confirmed that it failed to properly investigate. The company's "Detail Transaction History"—the only exhibit revealing the content of Ocwen's investigation of Daugherty's tradeline [JA 2669]—demonstrated that, though it investigated the 001 dispute code reported on the ACDV ("Not His/Hers"), it completely ignored the 007 code regarding payment history and account status. [JA 1162-63] Instead, Ocwen's transaction history shows that it received Equifax's ACDV at 1:40:41 AM on March 20, 2013 and completed its investigation at 1:40:46 AM on March 20, 2013—totaling a mere five seconds. [JA 1162]

**2. *Ocwen continues to receive additional dispute notices for more than a year.*** Over the next year, Ocwen received more disputes regarding Daugherty's inaccurate tradeline, but did nothing to correct it. For example, on June 2, 2013, Ocwen received another ACDV from Equifax about the tradeline

_____

[2] Code 007 is also referred to as code 106; the difference in the code number reflects different reporting systems, but it has the same meaning. [*Compare* JA 1093 *with* 1254]

that inaccurately stated that Daugherty was in foreclosure. [JA 787]. Ocwen's transaction history notes reveal that it received this ACDV at 11:52:13 PM, that Daniel Wesley was the investigator, that the borrower said the account was "not his," and the investigation revealed "that the borrower had signed the note, that the social security number matches, hence responsible." [JA 1171] As these notes reflect, Ocwen did not consider all the relevant information it had about Daugherty's concerns or provided by the ACDV—including that Daugherty was past due and in foreclosure. And it again confirmed the false tradeline.[3]

Ocwen repeated this pattern a month later. After receiving another ACDV showing that Daugherty's credit report inaccurately stated that he was still 120 days past due and in foreclosure, the company took only thirty seconds to falsely verify that Daugherty was in foreclosure. [JA 1176]

Other similar examples abound. At least four more times—until March 2014—Ocwen received notices that should have prompted it to undertake a reasonable investigation of the erroneous tradeline. And every time, it spent

---

[3] Highlighting the cursory nature of Ocwen's investigation is the fact that barely two minutes later, Ocwen's same investigator, Daniel Wesley, received another ACDV regarding the exact same account number, but with a different tradeline. [JA 1172] That tradeline accurately reported that Daugherty was current on his loan, and the investigator verified the information. [JA 785] Thus, in the span of less than three minutes, the same Ocwen investigator verified that Daugherty was simultaneously current and in foreclosure on the same account. [JA 1171-72]

10

minimal time investigating before confirming the inaccurate information. [*See* JA 1102-07, 1186, 1194-95, 1207, 1215-16]

**3. *As Daugherty's mortgage payment nears, Ocwen continues to ignore the credit inaccuracies.*** A few months before Daugherty's balloon payment was due, he approached Ocwen again. By letter dated March 19, 2014, he told Ocwen (and Equifax) that his credit report showed that he was 120 days late in March, June, July, October, and December 2013, and past due in the amount of $6,128.00. [*Id.*; JA 1245-47] He reiterated that this information was "inaccurate," making clear notations as to exactly which information he was disputing. [JA 1246]:



Daugherty copied the same letter to Equifax, prompting it to send yet another ACDV to Ocwen with the 007 code. This time, Ocwen's response to Equifax's ACDV purported to "modify" Daugherty's tradeline by changing the account to current (rather than 120 days past due) and zero balance past due (rather than $6,128.00). [JA 1254-55] However, Ocwen's investigation did not lead it to modify the portions of the ACDV showing "foreclosure proceedings started" and "5 or more payments past due." [*Id.*] Ocwen's notes do not show any investigation regarding foreclosure or payments past due. [JA 1071] Thus, although Ocwen confirmed that Daugherty's account was current, it nonetheless did not investigate, much less correct, all the inaccurate information that Equifax— and Daugherty through his March 19, 2014 letter—asked Ocwen to investigate. [*Id.*; JA 1254-55]

Daugherty kept in regular contact with Ocwen following these investigations, calling Ocwen on May 2, 2014 to discuss his loan. [JA 1226] Daugherty called again on June 9, 2014 to again dispute Ocwen's credit reporting. [JA 1231-32] During this call, Daugherty asked Ocwen to write a letter on his behalf stating that he was current, which he could then show to other lenders as he tried to refinance his loan. [*Id.*] Ocwen refused.

Because his credit report still showed foreclosure, Daugherty submitted another dispute to Equifax, which Ocwen received in June 2014. [JA 1234; 1256-

12

57] Ocwen's response to Equifax's ACDV again purported to "modify" Daugherty's tradeline by correcting the days past due and past-due balance. [JA 1256-57] Notably, Ocwen's investigation did not reveal that Daugherty had previously disputed or that Ocwen had partially corrected the same incorrect tradeline before. Yet again, Ocwen's response to the June 2014 ACDV failed to correct the report of "5 or more payments past due." [*Id.*] Ocwen's notes do not show any investigation into the past due payments notation. [JA 1235] And while Ocwen's investigation verified that Daugherty's account was current, it still left inaccuracies to haunt his credit report. [*Id.*; JA 1256-57]

**4.** ***Daugherty submits his dispute to the Consumer Financial Protection Bureau.*** In March 2014, when Daugherty complained directly to Ocwen, he also submitted an online complaint to the CFPB. [JA 1248-53] Ocwen received Daugherty's CFPB dispute on March 26, 2014, [JA 1064] and responded to the CFPB on April 8, 2014 with a letter that failed to address Daugherty's concerns that the tradeline was still inaccurate. [JA 1066] The CFPB relayed Ocwen's response to Daugherty, who told the CFPB on April 17, 2014:

> I sent Ocwen a copy of my Equifax report. It shows me being currently past due $6,128.00 and being late 120 days in the months of March, June, July, October, and December. I understand Equifax is now showing that my loan is current, but they still show me being late 120 days all of those months. There is no way I can be satisfied with this as my loan will mature in July with Ocwen demanding a balloon payment for the balance. It appears neither Ocwen or Equifax is going to cooperate and time is a real issue to obtain a loan in time.  [JA 1250]

13

On June 26, 2014, Ocwen received a follow-up request from the CFPB, requesting that Ocwen state whether Daugherty was 120-days delinquent in March, June, July, October, and December 2013 and whether Ocwen updated its tradelines with the credit reporting agencies to state that Daugherty was current. [JA 1236] Ocwen responded with a non sequitur, explaining that Daugherty was delinquent in the year 2012. [JA 1237]

Four days later, on June 30, 2014, the CFPB again contacted Ocwen, attaching records showing Ocwen the incorrect tradeline reported against Daugherty for the months of March, June, July, October, and December 2013. [JA 1237] The CFPB demanded that Ocwen "provide documentation that show[s] that you have reported the consumer as current for those months." [*Id.*] In response to this demand, Ocwen sent an Automated Universal Data Form ("AUDF") to "update" Daugherty's account with all three CRAs. [JA 1258]

5. ***Ocwen continues to verify inaccurate information in August 2014.*** Despite its previous remedial efforts, in August 2014, Ocwen nonetheless again verified the inaccurate tradeline that stated that Daugherty was in foreclosure. [JA 1259] As indicated on the ACDV, in August 2014 the tradeline still indicated that Daugherty was past due and in foreclosure. [JA 1259-60] And although the ACDV contained both the 001 and 106/007 dispute codes, Ocwen's notes reveal that it only investigated the 001 code about whether the account

14

belonged to Daugherty. [JA 1088] Ocwen again did not investigate Daugherty's dispute regarding his previous account status. [*Id.*]

Ocwen was never going to conduct a reasonable investigation. When asked if Ocwen's dispute investigators look to all information on an ACDV, Ocwen answered: "[t]hey're not told to do that unless it's specified on the dispute code." [JA 2679-80] Ocwen did not conduct a full investigation into payment history and account status even when the 106/007 dispute code was indicated, or even when it had been informed through Daugherty's direct communications and the CFPB's investigation that there were serious inaccuracies in the tradeline. Indeed, Ocwen's representative repeatedly testified that Ocwen conducted superficial investigations:

> Q. Was [the investigation] superficial or not?
> A. I believe it was.
> Q. So you believe it was a superficial investigation?
> A. Yes

[JA 2837] Overall, Ocwen conducted this superficial investigation 24 times.

## C.    Procedural History

Just days before the balloon payment was due, Daugherty filed this lawsuit against Ocwen alleging negligent and willful violations of FCRA, section 1681s-2(b)(1), for failing to undertake a reasonable investigation when he disputed the

inaccurate information on his credit reports. [JA 1406-07] In response, Ocwen contended that it fully complied with the statute. [*Id.*][4]

After the district court denied Ocwen's motion for summary judgment (as discussed below) [JA 1416-23], the case proceeded to trial for six days in May 2016. The trial was bifurcated.[5] The jury returned a verdict finding Ocwen liable for willfully violating the FCRA, and awarded $6,128.39 in compensatory damages. [JA 3286] After the punitive damages phase of the trial, the jury awarded $2,500,000 in punitive damages. [*Id.*; JA 3288]

Seeking to undo the jury's factfinding and the district court's careful consideration of the law and evidentiary issues, Ocwen filed a slew of post-trial motions, including for renewed judgment as matter of law, under Rule 50(b), for a new trial or to alter the judgment under Rules 59(a) and (e), for relief from

---

[4] Daugherty also sued Equifax, but all claims against Equifax were settled before trial. [JA 1407]

[5] Ocwen asserts that this matter was not bifurcated. [Ocwen Br. 24] Yet Ocwen filed a motion requesting that the Court bifurcate the punitive damages phase of the trial [JA 1787], Daugherty consented [JA 1913], and the judge conducted a bifurcated trial in accordance with this agreement by response filed on April 29, 2016. [JA 1913] Prior to instructing the jury, the district court affirmed:

> "the only matters the jury needs to consider, whether or not they find liability by virtue of conducting a reasonable investigation, then willful or negligent, and then damages. And of course, depending on what they do with respect to willfulness or negligence, we'll discuss the issue of punitives."

[JA 3115; *see also* JA 3298] Tellingly, Ocwen never objected that the trial was not bifurcated; the district court held that it "clearly indicated that the case would be bifurcated"; and "[i]t was obvious to all parties in attendance that the case had been bifurcated." [JA 3306 fn. 2] Ocwen is wrong to assert otherwise on appeal.

16

judgment under Rule 60(b), and for remittitur. After applying settled legal principles to examine each of these scattershot motions, the judge refused to undo the jury's determination. The relevant background of each of these challenges renewed on appeal follows.

### 1. The district court rejects Ocwen's contention that it was entitled judgment as a matter of law on willfulness.

Before trial, Ocwen moved for summary judgment, arguing that its investigations were objectively reasonable and hence that it did not willfully violate the FCRA. [JA 1406] Though Ocwen asserts (at 27) that the district court "refused . . . to address Ocwen's arguments as to willfulness ***at all*** prior to trial," the district court carefully considered this issue and ultimately concluded that genuine issues of material fact "exist . . . as to whether Ocwen's investigation was reasonable." [JA 1423] In denying summary judgment, the district court explained that Fourth Circuit precedent, including *Johnson*, 357 F.3d at 431, required Ocwen to conduct a "reasonable" and "searching"—rather than a "superficial" or "minimal"—investigation of the disputed credit information. [JA 1417] That investigation, moreover, could not be restricted to "information provided by the CRA," especially when (as here) the consumer provided additional information to the CRA describing the nature of the dispute. [JA 1417-18]. Given this standard, the court rejected Ocwen's contention that "as a matter of law, its investigation of the Plaintiff's disputes was reasonable." [JA 1418]

17

Sifting through the record evidence, it explained that Ocwen received multiple ACDVs from Equifax disputing "the account status and payment history," two letters from Daugherty "about specific inaccuracies in his Equifax report," and "inquiries and information from the CFPB about the Plaintiff's account." [JA 1421-22] Analyzing these facts "in the light most favorable to [Daugherty]," the court concluded that Ocwen had sufficient information about potential inaccuracies in the contested tradeline as to create a "genuine issue of material fact as to whether Ocwen conducted a reasonable investigation of [Daugherty's] disputes." [JA 1421]

Then again, on a motion for directed verdict on the same issue, the district court likewise rejected Ocwen's contention that the question of willfulness should be taken away from the jury. On the record, the court conducted a lengthy discussion of the Supreme Court's *Safeco* decision, recognizing that when the defendant's conduct is objectively reasonable, it cannot be liable as a matter of law for willfully violating the statute. [JA 3092-94] But the court found *Safeco*'s safe harbor "inapplicable." [JA 3296] As it explained:

> This case is about reasonable investigation . . . . [Section 1681s-2(b)(1)] isn't ambiguous. And, plus, we all know that there's been precedent in case law sufficient to guide a furnisher like Ocwen at least since—at least since 2004 if we look to the *Johnson* case. So there's been precedent and there's no ambiguity in the statute like the facts in *Safeco* presented for the Court's consideration. So, again, I find that *there is sufficient evidence here, should the jury decide to accept it, to support a finding of willfulness*. [JA 3093-94 (emphasis added)]

18

In short, the district court found that Ocwen's investigations were not objectively reasonable as a matter of law; instead, Daugherty's evidence, if credited by the jury, could lead the jury to find that Ocwen willfully violated the FCRA.

### 2. The district court permits Daugherty to introduce Equifax ACDVs because Ocwen failed to produce its ACDVs.

At trial, the district court permitted Daugherty to introduce Equifax's ACDVs. Both during trial and after, Ocwen argued that these documents were improperly admitted because they were not specifically named in Daugherty's Rule 26(a)(3) disclosures. The district court rejected this argument because "all parties knew that the documents had to exist, that Ocwen had its own corresponding versions of the documents, that the documents were part of discovery, and that there was no prejudice" or "unfair surprise" to Ocwen by admitting them. [JA 3303]

Indeed, the Equifax ACDVs "mirror[] and match[]" the ACDVs Ocwen had in its possession. [JA 883] As Ocwen's expert testified, Equifax and Ocwen ACDVs would "cosmetically look different" but would contain "the same information." [JA 3071] As a result, the district court explained that admitting the documents could cause no prejudice because "it's clear to everyone here that there would, in fact, be Ocwen documents that correspond to those Equifax documents

19

given the way the process works and given the disclosure of the latter documents."
[JA 2406-10]

And not only did Ocwen already have this information, but during discovery it failed to produce its ACDVs for disputes between March 2013 and March 2014—twelve total. When Daugherty informed Ocwen's corporate representative that Ocwen's e-Oscar ACDV response forms were never produced for these months, Ocwen responded, "It's there." [JA 884]. But, as the district court concluded, the documents were not produced, and "it would in fact be unfair for Ocwen to have had copies of the documents identical to the Equifax documents, not produced them, and then prevent the plaintiff from using the Equifax documents." [JA 3303 (alterations omitted)]

Moreover, eliding any concern about the documents' accuracy or authenticity, both parties relied on the Equifax ACDVs before trial. Ocwen extensively used Equifax ACDV printouts when deposing Daugherty and introduced them as deposition exhibits. [JA 785-92; 829-34] And Ocwen did not object to Daugherty's expert's use of the Equifax documents in his report [JA 91]; indeed, Ocwen's expert did the same when preparing his report and opinions [JA 142].

### 3.    The district court excludes irrelevant evidence regarding Aggressive Credit Repair.

While conducting discovery in this case, Ocwen learned for the first time that Daugherty had retained a credit repair company, Aggressive Credit Repair ("ACR"), in March 2013 to assist him in clearing up his credit. [JA 755] And Ocwen sought to introduce evidence of what it claimed were ACR's frivolous actions. The district court properly excluded such evidence as irrelevant. [JA 3305]

In reaching this decision, the court recognized that Ocwen was not aware of the contents of the ACR disputes when it was conducting its investigations. [JA 857-58] (Neither was Daugherty. [JA 757-58]) Ocwen did not see any letters from ACR during its investigations. Instead, it only received the Equifax ACDVs. And Ocwen testified that it investigated each dispute and never disregarded any dispute as frivolous. [JA 867-68] Logically, then, the reasonableness of Ocwen's investigation could not have hinged upon information from ACR that it did not possess. And the district court accordingly excluded it from the jury's consideration.

### 4.    The district court allows Daugherty's expert to testify as to the customary standards in the industry.

During the trial, the district court allowed the testimony of Daugherty's expert, Evan Hendricks—a recognized expert on credit reporting. [JA 2517-23]. Hendricks's testimony explained the ACDV process in simple terms based on his

expertise and experience. [JA 2540-04, 2590] Specifically, Hendricks testified about the customary meaning of ACDV codes based on "his years of experience in the credit reporting industry." [JA 3304] As to the 106/007 code, in particular, Hendricks explained that it signaled serious inaccuracies in the tradeline, including potential problems with the current payment status, previous payment history, account status generally, and payment rating. [JA 2536, 3-9; 2551, 21-23; 2608] Based on his experience, he then opined that the presence of the 106/007 code required a furnisher to investigate "just about everything that has to do with the account" communicated on the ACDV. [JA 2536]

At trial, Ocwen objected that Hendricks was testifying to opinions that were not disclosed in the expert report based on documents that were also allegedly not included. After reviewing the matter in detail, looking to the relevant pages of the report, and directly questioning Hendricks, the district court overruled the objection. [JA 2529-36] As the district court explained, the substance of Hendricks's testimony was "generally included in the language of the report" [JA 3118] and Hendricks gave "no opinion…that's inconsistent with" his report [JA 2526].

The district court further rejected Ocwen's contention that Hendricks was providing "legal conclusions," when testifying about what type of investigation was implicated by particular ACDV codes. Instead, "Hendricks' statements regarding

22

the requirements of certain codes on an ACDV were based on his years of experience in the credit reporting industry." [JA 3304] And, importantly, "he did not, either overly or implicitly attempt to provide a legal opinion on the requirements of the FCRA." [*Id.*]

### 5. The district court admits publicly available SEC filings during the punitive damages phase of the trial.

During the punitive damages phase of the trial, the district court allowed Daugherty to admit publicly available SEC filings of Ocwen's parent company and sole shareholder, Ocwen Financial Corporation ("OFC")—a decision Ocwen contested. But the district court concluded that Ocwen's own actions made admitting such evidence necessary. [JA 3288]

Specifically, three days before the jury's deliberation, Daugherty informed Ocwen that, if he prevailed on his willfulness claim, he intended to recall Ocwen's corporate representative as a witness regarding punitive damages. [JA 3200] The witness was needed to testify as to Ocwen's net worth—a relevant factor for the jury to evaluate punitive damages. The district court had not excused the witness, but, nonetheless, Ocwen refused to make its witness available to testify in the punitive damages phase. [JA 3288] When Ocwen informed the district court that its unexcused witness was in another state, Daugherty sought to introduce OFC's SEC filing as a back-up option. [JA 3197]

23

After granting Ocwen's counsel time to review the financial documents [JA 3198], the district court admitted them. It emphasized that the "admission of the documents was particularly appropriate in light of Ocwen's failure to make its Rule 30(b)(6) witness and corporate representative, Sandra Lyew, available to testify as to Ocwen's assets, despite the fact that the Court had not excused Lyew, and the fact that the Plaintiff had previously notified Ocwen of its intent to recall Lyew, should the jury return a verdict finding that Ocwen willfully violated the FCRA." [JA 3288-89] The district court further found that it was "indisputable" that Ocwen was aware of the SEC filings, and that Ocwen did not object to the relevance of the documents under Rule 401 or argue that the documents were unfairly prejudicial under Rule 403. [JA 3289]

During arguments, both parties relied on the SEC filings. Daugherty suggested an adequate punitive damages amount when he indicated that one-tenth of one percent of OFC's cash on hand would be $280,000. [JA 3210] Ocwen explained to the jury that the contents of the SEC filings showed how much money OFC lost on a regular basis, emphasizing that Ocwen lost $102 million in the first quarter of 2016, with a $68 million loss on loan servicing alone.  [JA 3213-14]. Ocwen presented no other evidence regarding its assets or alleged financial difficulties.

24

### 6. The district court affirms the jury's conclusion that Ocwen's reprehensible conduct merited significant punitive damages.

Finally, the district court denied Ocwen's claim for remittitur under the reprehensibility guideposts established in *BMW of North America Inc. v. Gore*, 517 U.S. 559 (1996), and applied to the FCRA by the Fourth Circuit in *Saunders*, 526 F.3d at 152-55. [JA 3311-12] The district court upheld the jury's finding on reprehensibility and found that the punitive damages award was necessary to "serve as a meaningful deterrent to Ocwen's reprehensible conduct." [JA 3316]

In reaching this conclusion, the district court recognized that punitive damages may be imposed by a jury to "further legitimate interests in punishing unlawful conduct and deterring its repetition." [JA 3310] And it noted that Congress specifically provided for punitive damages under the FCRA even though compensatory and statutory damages were likely to be low, and there was unlikely to ever be physical injury. [JA 3313-14] Applying the Supreme Court's reprehensibility factors, the district court further emphasized that Daugherty was in a financially vulnerable position, and suffered a significant emotional toll from Ocwen's repeated unlawful conduct. [JA 3314] The court explained that it would not displace the jury's determination that "Ocwen would not change its behavior absent the imposition of significant punitive damages." [*Id.*] Given the "relatively modest amount of total compensatory damages," the district court reasoned that it

25

was not bound to reduce the punitive damages award based on the ratio alone; noting that this Court had already rejected such arguments in cases involving less reprehensibility than the jury found here. [JA 3315-16]

## SUMMARY OF ARGUMENT

**I.** It has been clearly established for over a decade that the FCRA requires furnishers like Ocwen to conduct a "reasonable investigation" to "determine whether the disputed information [in a credit tradeline] can be verified." *Johnson*, 357 F.3d at 431; *see* 15 U.S.C. § 1681s-2(b)(1). The question in this case is whether Ocwen did just that. Ocwen contends that its investigations were objectively reasonable as a matter of law, so it cannot be liable for a "willful" violation of the FCRA under the Supreme Court's decision in *Safeco*. But the record shows otherwise. After carefully evaluating all of the evidence, the district court properly concluded that it was up to the jury to decide whether Ocwen failed to conduct a reasonable investigation and created an unjustifiably high risk of violating the FCRA.

In particular, Ocwen contends that the question should have never reached the jury because it reasonably interpreted the FCRA as allowing it to cabin its investigation to the dispute code provided by Equifax on the ACDV. But evidence presented to the jury showed that Ocwen did not even conduct a full investigation based on ACDV dispute codes. Moreover, Ocwen has no support from the statute,

26

precedents, or FTC to support its position. Rather, as the district court concluded, given the myriad complaints and information Ocwen had regarding the incorrect tradeline, Ocwen could not establish as a matter of law that its minimal, cursory investigations satisfied the FCRA.

**II.** Without a convincing argument to take the case away from the jury, Ocwen seeks a second bite at the apple, taking scattershot aim at various evidentiary rulings it claims were erroneous and prejudicial. They were neither. *First*, there was no error in the district court's decision to allow the jury to consider Equifax's ACDVs, when Ocwen failed to produce its own ACDVS, knew about the Equifax versions (which contained the same information), and could not claim "unfair surprise." [JA 3303] *Second*, Daugherty's expert testified, based on his expertise and his experience, to non-legal opinions fairly encompassed within his expert report. *Third*, the district court properly excluded evidence regarding Aggressive Credit Repair because it was irrelevant. Ocwen never saw any letters from ACR in conducting its investigations, so they could not have impacted whether Ocwen acted reasonably based on the information it had. *Finally*, when Ocwen refused to make its corporate representative available to testify in the punitive damages phase of the trial—despite her never being excused by the court—it was well within the district court's discretion to allow Daugherty to introduce publicly available financial documents of Ocwen's parent company and

sole shareholder. And there was no misconduct that would warrant striking the jury's punitive damages award.

**III.** Ocwen is not entitled to a remittitur. Applying the Supreme Court's factors, the district court correctly concluded that there was ample evidence supporting the jury's decision that "Ocwen repeatedly refused to reasonably investigate the Plaintiff's credit disputes," [JA 3314] and that such repeated and willful violations of the FCRA were highly reprehensible. Moreover, given this unjustified conduct, and the small amount of compensatory damages at issue, the Court is not tethered to the single-digit ratios Ocwen seeks. Punitive damages must be calibrated to punish the defendant and deter future violations. That's what Congress wanted when it specifically provided for punitive damages in private FCRA actions, and it's why this Court has previously affirmed punitive damages well in excess of single-digit ratios in FCRA cases. Because that is exactly what the jury's award constitutionally accomplishes here, it should be affirmed.

## STANDARD OF REVIEW

**1. *Judgment as a matter of law.*** In reviewing a district court's decision on summary judgment, judgment as a matter of law under Rule 50(a) or renewed motion for judgment as a matter of law under Rule 50(b), the Fourth Circuit applies a *de novo* standard. *Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc.*, 673 F.3d 294, 297 n.1 (4th Cir. 2012); *Bank of Montreal v. Signet Bank*, 193 F.3d 818, 826 (4th

28

Cir. 1999). The reviewing court must view the evidence, and draw all reasonable inferences in the light most favorable to the non-moving party, here Daugherty. *See Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 714 (4th Cir.2013); *Myrick v. Prime Ins. Syndicate, Inc.*, 395 F.3d 485, 490 (4th Cir. 2005). Hence, Ocwen incorrectly asserts that review on a Rule 50 motion should be in the "light most favorable to Ocwen." [Ocwen Br. 25] Rather, the Court must draw every legitimate inference in the nonmoving party's favor. *Tools USA & Equip. Co. v. Champ Frame Straightening Equip. Inc.*, 87 F.3d 654, 656-57 (4th Cir. 1996).

**2.  *New trial or relief from judgment.*** Absent a clear abuse of discretion, an appellate court shall not grant a new trial or relief from judgment under Rule 59 or Rule 60(b). *Bristol Steel & Iron Works v. Bethlehem Steel Corp.*, 41 F.3d 182, 186 (4th Cir. 1994); *U.S. v. Williams*, 674 F.2d 310, 312 (4th Cir. 1982). This standard is highly deferential to the district court "because the district judge is in a position to see and hear the witnesses and is able to view the case from a perspective that an appellate court can never match." *Bristol Steel*, 41 F.3d at 186.

**3.  *Remittitur.*** The standard of review for a determination of the constitutionality of punitive damages is *de novo. Saunders*, 526 F.3d at 152.

29

# ARGUMENT

## I.    The issue of willfulness was properly presented to the jury.

Ocwen argues that its procedures for investigating credit reporting disputes are "objectively reasonable" so it cannot, as a matter of law, be liable for a willful violation of the FCRA under the Supreme Court's decision in *Safeco*. [Ocwen Br. 26-31] But, as the district court held, there were material questions of fact for a jury to decide as to whether Ocwen conducted a reasonable investigation given the facts and circumstances in this case, and as to whether such an investigation created a "an 'unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Safeco*, 551 U.S. at 49 (quoting *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)). [JA 1421]. Specifically, the district court emphasized that, given all the evidence showing that Daugherty communicated the nature of his dispute to Ocwen—including the tradeline's false statement that his account was past due and in foreclosure—a jury crediting such evidence could conclude that Ocwen's subsequent cursory investigations were unreasonable and created an unjustifiable risk of harm under section 1681s-2(B)(1). [JA 1422] Accordingly, there is no basis for disturbing the district court's conclusion that Ocwen's investigations were not objectively reasonable, entitling Ocwen to judgment as a matter of law.[6]

---

[6] Ocwen repeated this same argument no less than five times throughout the case, through its: (1) motion for summary judgment; (2) renewed motion for summary judgment; (3) motion *in limine* #1; (4) motion for directed verdict; and (5)

30

### A.    To obtain summary judgment on the question of willfulness, Ocwen had the burden to show that its actions were objectively reasonable as a matter of law.

Relying on the Supreme Court's decision in *Safeco*, Ocwen argues that its investigations were objectively reasonable, and therefore it could not have committed a "willful" violation of the FCRA. In *Safeco*, the Supreme Court held that "willful failure" under the FCRA, as set out in 15 U.S.C. § 1681n(a), does not necessarily require a knowing or intentional violation of the statute, but also "covers a violation committed in reckless disregard of the [statute]." 551 U.S. at 52. Drawing on the common law, the Court concluded that whether a defendant's conduct was "reckless" for the purposes of the FCRA required the application of "an objective standard: action entailing 'an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Id.* at 68 (quoting *Farmer*, 511 U.S. 825, 836 (1994)).   "[T]he Court explicitly rejected the argument that subjective bad faith must be taken into account in determining whether a defendant has acted recklessly, and therefore willfully, under FCRA." *Fuges v. SW Fin. Servs.*, 707 F.3d 241, 249 (3d Cir. 2012) (citing *Safeco*, 551 U.S. at 70 n.20).

The Court then provided some guidance to courts applying this "objective reasonableness" test. Where the FCRA provision at issue has "less-than-pellucid statutory text," as was the case in *Safeco*, the court must determine whether, at the

motion for judgment as a matter of law. The district court properly rejected it each time.

very least, the defendant's "reading has a foundation in the statutory text." 551 U.S. at 69-70. Bearing on that determination is whether any "court of appeals ha[s] spoken on the issue," or whether any "authoritative guidance has yet come from the FTC." *Id.* at 70.  But if the "statutory text and relevant court and agency guidance allow for more than one reasonable interpretation," even if the defendant follows the interpretation that the court ultimately rejects, the defendant could not be considered "a knowing or reckless violator." *Id.* at 70 n.20. Accordingly, the Court concluded that the defendant in *Safeco* was entitled to summary judgment because it unquestionably followed a reading of the statute that was "not objectively unreasonable." *Id.* at 70.[7]

Contrary to Ocwen's suggestion, *Safeco* did not establish that the question of recklessness must *always* be decided as a threshold issue by a court as matter of law. [Ocwen Br. 27] True, recklessness can be decided as a matter of law if, as in *Safeco*, the defendant indisputably followed an objectively reasonable (even if mistaken) view of the law. But *Safeco* did not abridge the well-established standard for summary judgment; it just applied it in a context where no material dispute of fact complicated whether the defendant's conduct was objectively reasonable. Indeed,

---

[7] In *Safeco*, the Court considered whether the defendants' interpretation of the statute was objectively reasonable, because there was no dispute that the defendants, in consultation with their legal counsel, had adopted and followed a particular *reading* of the FCRA. But where, as here, the case also concerns a pattern of conduct, the question is whether that *conduct* is reasonable given the text of the statute and relevant case law.

Ocwen itself recognizes—and string cites cases demonstrating—that, when there is a question as to whether the defendant's actions are "deficient" under the FCRA, courts "find a jury issue as to whether a furnisher recklessly violated the FCRA." [Ocwen Br. 33] And that is precisely what the district court did here.

### B. The district court correctly concluded that disputes of material fact precluded judgment as a matter of law as to whether Ocwen's investigations were reasonable.

Analogizing to *Safeco*, Ocwen attempts to characterize this case as just a dispute about dueling interpretations of the FCRA, where its interpretation of the statutory language is objectively reasonable. [Ocwen Br. 4, 22, 28] But that oversimplifies the nature of this case. Specifically, Ocwen argues that the question of recklessness should have been kept from the jury because, in its view, the only duty imposed on it by section 1681s-2(b) was to investigate "***the disputed information***" while Daugherty, it says, insists that the FCRA requires it to "**investigate everything, regardless of the dispute**." [Ocwen Br. 4 (emphasis in original)]. But that is not so. Daugherty does not argue—nor did the district court instruct the jury [JA 3130-34]—that the FCRA creates a duty to investigate everything in a tradeline, "diagnose" the problem, and "divine an unidentified error" even in the absence of notice that there is reason to investigate a particular inaccuracy. [Ocwen Br. 22, 28, 35]

Rather, the district court concluded that there were genuine issues of material fact as to whether Ocwen did indeed conduct reasonable investigation, as it concedes it must, of "the *disputed* information." [*Id.* at 4] That is, given evidence from which a jury could find that Ocwen "had available for review . . . information about potential inaccuracies," including "direct communications with the Plaintiff about the inaccuracies" and "knowledge that the Plaintiff's credit report inaccurately showed that Ocwen account was past due, and, in at least once instance, that foreclosure proceedings had commenced," there remained "issues of material fact as to whether Ocwen's investigation was reasonable." [JA 1421-23] There was ample evidence from which a jury could find that, given all the notice to Ocwen of the tradeline's inaccuracy, Ocwen's cursory investigation and inadequate remedial measures constituted a reckless violation of the FCRA. And that is exactly what the jury found. This Court should not reverse the district court's careful, record-based decision that Ocwen is not entitled to judgment as a matter of law.

> **1.    Under the FCRA's text and binding circuit precedent, Ocwen was required to conduct a reasonable investigation based on all information available about the nature of the dispute.**

When a furnisher like Ocwen receives notification of a dispute from a CRA, the FCRA, as clarified by Fourth Circuit precedent, requires the furnisher "to conduct a reasonable investigation of [its] records to determine whether the disputed information can be verified." *Johnson*, 357 F.3d at 431. That is, Ocwen

was required to undertake a "careful inquiry." *Id.* Indeed, as this Court held, it would make "little sense to conclude that, in creating a system intended to give consumers a means to dispute—and ultimately correct—inaccurate information on their credit reports," Congress meant for only a "superficial" or minimal investigation. *Id.* Numerous Circuits have adopted the Fourth Circuit's "reasonable investigation" standard. *See SimmsParris v. Countrywide Fin. Corp.*, 652 F.3d 355 (3d Cir. 2011); *Chiang v. Verizon New England, Inc.*, 595 F.3d 26 (1st Cir. 2010); *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1155 (9th Cir. 2009).

Ocwen's contention that it acted reasonably in limiting its investigation to the dispute code is first undermined by the evidence that Ocwen received the "106/007" dispute code indicating inaccurate payment history and status on at least eight ACDVs, yet still failed to correct all the inaccurate information. So even adopting its limited view of a "reasonable analysis" guided only by dispute codes, there would still be a fact question as to whether the cursory investigation Ocwen undertook was reasonable.

More critically, Ocwen cannot point to any split in authority to support its view (at 5, 20, 28, 34) that the FCRA allows Ocwen to restrict its investigation to the dispute code provided by the CRA, even when it has received other communication about the information the customer claims is inaccurate. Instead, the case law reflects that a furnisher may not limit its investigation to only that

information supplied by the CRA. *See Saunders v. Equifax Info. Servs.*, No. 3:05-cv-731, 2006 WL 2850647, at *7 (E.D. Va. Oct. 3, 2006), *aff'd sub nom.* 526 F.3d 142 (4th Cir. 2008). The furnisher must consider other information available to it, including earlier complaints or other communications received from the consumer before reinvestigation was even begun. *See McDonald v. OneWest Bank, FSB*, No. 10-1952, 2013 WL 858197, at *4 (W.D. Wash. March 7, 2013) ("[T]here is no statutory, policy, or case law justification for allowing a furnisher to ignore what it knows about a consumer's complaint simply because it was not included in the notice from the CRA."); *Rogers v. JPMorgan Chase Bank, N.A.*, No. 11-1689, 2012 WL 2190900, at *9 (W.D. Wash. June 13, 2012) (Chase's failure to take into consideration an oral report of identity theft lodged by the consumer raised a fact issue for the jury regarding the investigation's reasonableness.); *Watson v. Citi Corp.*, No. 2:07-cv-0777, 2008 WL 4186317, at *10 (S.D. Ohio Sept. 5, 2008) ("This information, together with Ms. Watson's sworn statement that she had provided the details of the settlement to Citibank by telephone prior to Citibank's receipt of the notice of dispute . . . , is sufficient to establish the existence of an issue of material fact.").

Therefore, as the district court concluded, "[Section1681s-2(b)(1)] isn't ambiguous" in requiring Ocwen to conduct a reasonable investigation into the disputed information based on all the information it has in its possession. [JA 3093-

94] And Ocwen knew this because, as the district court emphasized, "we all know that there's been precedent in case law sufficient to guide a furnisher like Ocwen at least since—at least since 2004 if we look to the *Johnson* case." [*Id.*] Accordingly, "there's been precedent and there's no ambiguity in the statute like the facts in *Safeco* presented for the Court's consideration." [*Id.*]

Ocwen attempts to push back against the district court's holding that, when presented with detailed information about a consumer's dispute, a furnisher cannot as a matter of law limit its inquiry to a cursory review of the dispute code on the ACDV. But none of the cases it cites is availing. In particular, Ocwen places emphasis on the Seventh Circuit's decision in *Westra v. Credit Control of Pinellas* for the proposition that a furnisher need only review the dispute code provided by a CRA. 409 F.3d 825, 827 (7th Cir. 2005). However, in *Westra* the furnisher had no other notice as to what the consumer was disputing beyond the ACDV dispute code—unlike the extensive clarification Daugherty provided. *Id.* at 826. Given the "scant information it received regarding the nature of [the plaintiff's] dispute," it was "beyond question" that the furnisher's verification process was "reasonable." *Id.* at 827. But, as the Seventh Circuit cautioned, "whether a defendant's investigation is reasonable is a factual question normally reserved for trial." *Id.*

Similarly, Ocwen cites to *Gorman v. Wolpoff & Abramson, LLP* for the proposition that a CRA's notice alone informs a furnisher of the nature of the

consumer's challenge. 584 F.3d at 1157. However, Ocwen ignores the fact that the Ninth Circuit there explained that even "[i]n deciding that the notice determines the nature of the dispute to be investigated, we do not suggest that it also cabins the scope of the investigation once undertaken." *Id.* at 1147 n.11. And although Ocwen cites to *Hinkle v. Midland Credit Management, Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016), the Eleventh Circuit there rejected Ocwen's position, stating:

> Although we agree that whether an investigation is reasonable will depend on what the furnisher knows about the dispute, we reject the proposition that a furnisher may truncate its investigation simply because the CRA failed to exhaustively describe the dispute in its § 1681i(a)(2) notice.

*Hinkle*, 827 F.3d at 1306.[8]

Therefore, contrary to Ocwen's assertions, no Circuit has adopted Ocwen's policy of limiting investigations solely to the CRA dispute code when the consumer has provided additional information clarifying the nature of the dispute. Instead, "[w]hen a furnisher has access to dispute-related information beyond the information provided by the CRA, it will often be reasonable for the furnisher to review that additional information and conduct its investigation accordingly." *Id.* at

---

[8] Ocwen stretches other case holdings seeking support [Ocwen Br. 33], but those cases are distinguishable. *See, e.g.*, *Farren v. RJM Acquisition Funding, LLC*, 2005 WL 1799413, at *2 (E.D. Pa. July 26, 2005) (requiring escalated review procedures when there were repeated disputes regarding the same debt); *Boyd v. Wells Fargo Banks, N.A.*, 2016 WL 7323293, at *8 (S.D. Ga. Dec. 14, 2016) (dismissing FCRA claim because plaintiff failed to conduct discovery and "procur[e] the evidence it needs").

1303, 1306. This is a factual question, normally reserved for trial, just as the district court did here. *See id.* at 1303; *Westra*, 409 F.3d at 827.[9]

**2.    There was overwhelming evidence from which the jury could (and indeed did) conclude that Ocwen acted recklessly.**

The district court's thorough examination of the record on summary judgment, and again post-trial, revealed that there was ample evidence from which the jury could conclude that Ocwen did not conduct a reasonable investigation but instead acted recklessly.

*First*, Ocwen claims that it spent more than seconds on each investigation, yet it presented no records to rebut its Detail Transaction History—the only evidence regarding the time Ocwen spent on each investigation. [JA 2669] These records show that Ocwen's investigators completed investigations within seconds

---

[9] Nor is there merit to Ocwen's argument that it cannot be liable for failing to conduct a reasonable investigation because it did not, as it claims, report two tradelines to Equifax or otherwise cause the inaccurate tradeline. [Ocwen Br. 6; JA 1421] As the district court recognized, the FCRA imposes a duty of reasonable investigation when a consumer disputes information in his credit report. [JA 1417] The responsibility is not made contingent on the furnisher causing the problem, and that is not a fact question the jury was required to decide. Congress wanted consumers to be able to clean up inaccurate credit reports. 115 Cong. Rec. 2,412 (1969). So, as the district court held, even if Ocwen did not create the problem, that "do[es] not establish that there is no genuine issue of material fact as to whether Ocwen conducted a reasonable investigation of the Plaintiff's dispute under Section 1681s-2(B)(1)(A)." [JA 1421]

and confirmed contradictory tradelines within minutes. [JA 1186, 1102, 1194-95, 1103, 1207, 1104, 1215-16]

*Second*, the evidence demonstrated that Ocwen did not consider (consistent with its policy and protocols) Daugherty's multiple direct communications when investigating the ACDVs. [JA 836, 1226, 1231-32, 1245-47] Daugherty specifically complained in March 2013 that his "current" credit report inaccurately showed him as past due and in foreclosure, and again in March 2014 he indicated with circles and arrows all the pieces of faulty information in the tradeline. Yet Ocwen's investigations ignored Daugherty's explicit notice.

*Third*, the evidence demonstrated that at least eight ACDVs contained the 106/007 code—which signals to the furnisher that Daugherty had a dispute with, among others issues, payment history and status of the account. These codes gave notice to Ocwen that merely investigating if the account was "Not His/Hers" based on signature records would be insufficient to ameliorate Daugherty's concerns; at minimum, it had to investigate all the parts of the ACDV implicated by this quite sweeping code.

*Fourth*, the CFPB's investigation further alerted Ocwen to the myriad problems with the tradeline. But the evidence demonstrated that, even after modifying some of the tradeline after the CFPB investigation, Ocwen again—after

40

a cursory review—verified a tradeline showing Daugherty past due and in foreclosure. [JA 1259-60]

Despite the wealth of information it had over a 17-month period regarding the incorrect tradeline, Ocwen conducted only superficial investigations, continually verifying that Daugherty was in foreclosure (he was not) after reviewing only the signature page or social security number on his account. [JA 3400, 3404, 3407] The jury had more than sufficient basis to find a reckless violation of the FCRA: ample evidence showed that Ocwen conducted superficial investigations limited to the dispute code (and even omitting issues raised by the dispute code) and deliberately ignored the relevant information in its possession. And, indeed, Ocwen's implementation of this policy in Daugherty's case perfectly illustrates that Ocwen's reckless conduct creates an unjustifiable risk of perpetuating false credit information. This Court should not take that determination away from the jury.

## II.    The district court properly addressed evidentiary issues.

Seeking a new trial, Ocwen attempts to portray a range of evidentiary decisions by the district court as biased, one-sided, and riddled with errors. [Ocwen Br. 4-6] But the district court's thoughtful evidentiary decisions are closely tethered to the record and reflect a sound exercise of discretion. Indeed, "[t]he district judge is in a position to see and hear the witnesses and is able to view the case from a perspective that an appellate court can never match." *Bristol Steel*, 41 F.3d at 186.

41

And, as the district court concluded in reviewing these evidentiary decisions post-trial, there is no basis for ordering a new trial here or to alter the judgment. [JA 3299-305; 3285-92]

## A. The district court properly allowed the parties to rely on Equifax's copies of the ACDVs.

Ocwen first contends that the district court committed a prejudicial error in allowing Daugherty to admit Equifax's copies of the ACDVs even though they were not listed on Daugherty's Rule 26(a)(3) disclosures. [Ocwen Br. 37-39] But, as the district court held, there was neither error nor prejudice. [JA 3303] Instead, as the district court recognized, it would be "unfair [to Daugherty]" not to get to use the documents because Ocwen had copies of the documents, failed to produce them, and relied upon them in depositions. [*Id.*] Ocwen cannot now claim it was "ambush[ed]" at trial from their admission. [Ocwen Br. 37]

Multiple reasons support the district court's decision to admit the Equifax ACDVs. *First*, all parties "knew that the documents had to exist" so there was no "unfair surprise" to Ocwen. [JA 3303] Contrary to Ocwen's suggestion (at 38), the ACDVs were not just "one of thousands of documents produced in discovery." They were central to the key issue in this case: the investigations Ocwen undertook in response to these same ACDVs. Indeed, both parties had already relied on the Equifax ACDVs prior to trial, when conducting depositions and preparing expert reports. For instance, Ocwen extensively used Equifax ACDVs when deposing

42

Daugherty and introduced them as deposition exhibits. [JA 785-92; 829-34] There is no merit to Ocwen's contention (at 38) that it was prejudiced by "the surprise [of] their last minute identification as trial exhibits."

*Second*, Ocwen did not produce its copies of the ACDVs for the twelve disputes between March 2013 and March 2014. It should not benefit from its failure to do as required. As the district court stated: "[B]ecause [Ocwen] didn't produce the very same documents that could be obtained elsewhere, [to] not be able to use them…would be very, very unfair to the Plaintiff given the whole scenario here." [JA 2410, 2416-21; JA 3303]

*Third*, Equifax's ACDVs contained the exact same information as Ocwen's ACDVs. As Ocwen confirmed, though Equifax's and Ocwen's ACDVs may "cosmetically look different," because the ACDVs are on the e-Oscar system, the information they showed "mirrors and matches." [JA 863, 883, 3071] Thus, it was "clear . . . that there would, in fact, be Ocwen documents that correspond to those Equifax documents given the way the process works and given the disclosure of the latter documents." [JA 2406] The Equifax ACDVs, therefore, provided a perfect substitute for the documents Ocwen failed to produce. Accordingly, there was neither error nor prejudice meriting a new trial. *See Creekmore v. Maryview Hosp.*, 662 F.3d 686, 693 (4th Cir. 2011).

43

## B.    The district court properly allowed Daugherty's expert to testify to opinions based on documents identified in his report and his professional experience.

Ocwen contends that Daugherty's expert, Evan Hendricks, testified based on documents that were not disclosed in his report and to impermissible legal opinions that were also not encompassed in his report. Again, looking to the details of the report and having carefully reviewed Hendricks's testimony, the district court properly rejected these arguments. [JA 3304]

Ocwen is wrong when it states (at 40) that Hendricks never identified the Equifax ACDVs on which he relied for his report. Hendricks's report states that he reviewed all of the Equifax ACDVs that were admitted as exhibits in this trial when he drafted his report. [JA 121] And his report references two investigations—and specific ACDVs—as exemplary of his review. [JA 91] Indeed, upon objection at trial, the district court carefully looked at the report, questioned Hendricks, and overruled Ocwen's objection that the documents were not sufficiently identified. [JA 2529-36]

Further, Hendricks did not testify to any improper opinions. Ocwen specifically challenges Hendricks's testimony that the 106/007 dispute code requires the furnisher to investigate "everything" on the ACDV, and that when a furnisher responds to an ACDV with such a code, anything it does not modify is considered "verified" by the response. The 106/007 dispute code requires a

44

furnisher to investigate: (1) current history; (2) previous history; (3) payment history; (4) payment history profile; (5) account status; and (6) payment rating. [*See* JA 1093, 1254] The all-encompassing nature of this dispute code is evident from the code itself. And, more pertinently, as the district court concluded, all of these opinions were generally encompassed within Hendricks's report, so were properly admitted at trial. [JA 3304] Nor did they constitute legal opinions. As the district court concluded, "Hendricks' statements regarding the requirements of certain codes on an ACDV were based on his years of experience in the credit reporting industry and he did not, either overtly or implicitly, attempt to provide a legal opinion." [*Id.*] Because Ocwen "cannot show any substantially erroneous evidentiary ruling giving rise to a miscarriage of justice," there is no reason to order a new trial. [JA 3305]

### C.    The district court properly excluded irrelevant evidence regarding a credit repair company.

Nor did the district court err in excluding testimony from Lorin Hanks, an employee of Aggressive Credit Repair ("ACR") who assisted Daugherty in attempting to resolve the inaccurate Ocwen tradeline. The district court rejected testimony regarding ACR as irrelevant, concluding: "[B]ecause Ocwen 'never received' the letters sent by Mr. Hanks to Equifax, and because this case focused on 'whether or not Ocwen conducted a reasonable investigation based on the

45

information that it had,' Mr. Hanks['s] testimony was 'not relevant for the jury's consideration.'" [JA 3305] That decision was well within the court's discretion.

In attempting to help Daugherty resolve his credit dispute, ACR sent multiple letters to Equifax reporting the inaccurate tradeline. Equifax received these letters and generated ACDVs that were communicated to Ocwen. But Ocwen never saw the contents of the ACR letters (until discovery in this case). As Ocwen's representative testified, it never received any ACR letters from ACR directly or from Equifax; instead, Ocwen only received the ACDV with the tradeline information. [JA 857-58] Because Ocwen never saw the contents of these letters—only the ACDVs they prompted—the district court found that they had no bearing on whether Ocwen, once receiving the ACDV, conducted a reasonable investigation.

Despite never seeing the ACR letters when conducting its investigations, Ocwen argues that they were "directly relevant to [its] obligations under the FCRA to investigate the disputes" because they show that the disputes were "vague, redundant, frivolous, and never identified a duplicate tradeline." [Ocwen Br. 42-43] But, as the district court emphasized, the question in the case focused on "whether or not Ocwen conducted a reasonable investigation based on the information that it had." [JA 3305] Ocwen never had the ACR letters, nor did it ever disregard a dispute as frivolous. [JA 857-858] Therefore, Ocwen cannot claim

46

ACR had any impact on its investigations apart from what got translated into the ACDVs. So the district court properly excluded Hanks's testimony from trial.

### D. The district court did not err in admitting the financial documents of Ocwen's parent company.

Grasping, Ocwen next claims it was "ambush[ed]" by evidence of its own financial net worth and that the admission of financial information regarding its parent company and sole shareholder, Ocwen Financial Corporation ("OFC"), merits striking the jury's award of punitive damages. [Ocwen Br. 44, 47] Specifically, the court allowed Daugherty to admit OFC's "10-K," a publicly available SEC filing that describes OFC's financial resources. [JA 3306] The district court found that "the introduction of the publicly filed documents of Ocwen's parent company was appropriate . . . in light of Ocwen's failure to provide the Plaintiff with access to Ocwen's corporate representative." [JA 2390] Ocwen cannot turn its own failures at trial into an argument to strike punitive damages; the district court would not let it, and neither should this Court.

In challenging the district court's ruling, Ocwen first argues that OFC's financial documents should not have been admitted because they were never disclosed before trial. But it ignores the full context in which the district court determined that the documents nevertheless should be admitted. As the district court emphasized, Daugherty only sought to introduce these documents *after* Ocwen made it impossible for him to otherwise admit evidence of Ocwen's net

47

worth. [JA 3290] Daugherty, for example, sought information regarding Ocwen's net worth in discovery, but Ocwen stonewalled. [JA 70-72; 344-45] As the district court found, it "failed to produce any documents concerning its net worth in discovery." [JA 3290]

Further, Ocwen "failed to produce a witness capable of testifying to its net worth." [*Id.*] During the liability phase of the trial, Sandra Lyew testified as a corporate representative for Ocwen; the district court did not excuse her from trial. And Daugherty notified Ocwen that, if the jury returned a verdict finding Ocwen liable for willful violations of the FCRA, it intended to recall Lyew, to testify as to the company's assets. [JA 3306] Yet Ocwen would not make Lyew available to testify in the punitive damages phase of the trial. It now tries to blame Daugherty, saying he should have questioned her "related to punitive damages while she was on the stand . . . in his case in chief." [Ocwen Br. 46] But given that the district court, "clearly indicated that the case would be bifurcated as the issues of culpability under the FCRA and punitive damages," [JA 3306] its blame is misplaced. Instead, Ocwen would not make Lyew available to testify, "despite [her] never having been excused by the Court," justifying the court's decision to allow Daugherty to rely on OFC's financial documents as a back-up. [JA 3290-91]

Moreover, there is no merit to Ocwen's claim that the documents were "false." [Ocwen Br. 45, 47] Ocwen claims that because the documents represented

48

OFC's net worth, rather than Ocwen's, they were "false" and could not be relied upon by the jury. [*Id.*] But Ocwen never argued that the documents were irrelevant—nor could it. Ocwen is solely owned by OFC, and the documents, utilized by both Daugherty and Ocwen in closing arguments, explains that OFC "owns all of the outstanding stock of its principal operating subsidiary, Ocwen Loan Servicing, LLC (OLS)."  [JA 3646] The district court found that "the parent is the sole shareholder of Ocwen, [so] the Court has no concerns about the propriety of admitting the parent company's public SEC filings [when] . . . Ocwen failed to produce any documents concerning its net worth in discovery, . . . [or] a witness capable of testifying to its net worth." [JA 3290-3291] Highlighting its relevance, both parties relied on the documents in the punitive damages phase of the trial; Ocwen argued to the jury that OFC's $102 million and $68 million losses in the prior quarter warranted minimal punitive damages, [JA 3213-14] and Daugherty argued that $280,000, or one-tenth of one percent, up to one percent, would be a reasonable award.

As other courts have recognized, especially when the defendant fails to otherwise produce evidence of its net worth, evidence regarding the parent corporation's net worth is admissible. *See TXO Prod. Corp. v. All. Res. Corp.*, 419 S.E.2d 870, 890 (1992), *aff'd*, 509 U.S. 443 (1993) (when defendant "was not

forthcoming during discovery with information about the worth of [its company]," parent company's financial status admissible).

Lastly, Ocwen argues in the alternative (at 47-48) that the jury's punitive damages award must be stricken under Rule 60(b) because: (1) Ocwen was precluded from presenting a "meritorious defense" regarding the amount of punitive damages that it could have made had Daugherty made the "proper disclosure" of the OFC financial information; and (2) Daugherty engaged in misconduct by conflating Ocwen and OFC in the punitive damages phase of the trial. The district court properly rejected these arguments too, applying this Court's decision in *Schultz v. Butcher*, 24 F.3d 626, 631 (4th Cir. 1994). [JA 3288-91] Ocwen's vague contention that, with more notice that Daugherty was going to use OFC's financials, it could have reduced the amount of the punitive damages award, is not enough to merit setting aside the award under *Schultz*. And, regardless, there was no misconduct because, unlike in *Schultz*, Daugherty "did not withhold documents requested by Ocwen prior to trial." [JA 3290] Moreover, as the district court concluded—having observed Daugherty's counsel arguing to the jury regarding these financial documents—Daugherty did not misrepresent the contents of the exhibit or mislead the jury. [JA 3290-91] So there is no reason to set aside the jury's award or order a new trial as to punitive damages.

50

### III.    Ocwen is not entitled to remittitur.

As it did below, Ocwen contends that remittitur is warranted because the jury's punitive damages award exceeded a "maximum" ratio of 1:9 and so is not "constitutionally acceptable." [Ocwen Br. 49] That is wrong.

To begin, the Supreme Court has instructed courts that a judgment produced by fair procedures, an impartial jury, and "collective deliberation" based on evidence and argument is "entitled to a strong presumption of validity." *TXO*, 509 U.S. at 456-57. And that is especially true where a jury, after weighing the evidence, imposes punitive damages to further "legitimate interests in punishing unlawful conduct and deterring its repetition." *BMW,* 517 U.S. at 568. As this Court has explained, an award of punitive damages in FCRA cases—even in cases involving limited actual damages—comports with the underlying deterrent purpose of the FCRA. *Yohay v. City of Alexandria Employees Credit Union, Inc.*, 827 F.2d 967, 972 (4th Cir. 1987); *Saunders*, 526 F.3d at 152.

The jury here heard ample evidence to justify its award of punitive damages. The Supreme Court has "instructed courts reviewing punitive damages to consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable

cases." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416-18 (2003). The district court correctly considered these guideposts in rejecting Ocwen's bid to reduce the award. [JA 3308-16] This Court should affirm.

### A.     Ocwen's actions were reprehensible.

The first guidepost, often considered the most important, considers "the reprehensibility of the defendant's conduct." *Gore,* 517 U.S. at 575, 575 n.23 ("The flagrancy of the misconduct is thought to be the primary consideration in determining the amount of punitive damages.") The Supreme Court has explained that this inquiry focuses on whether:

> [1] the harm caused was physical as opposed to economic; [2] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [3] the target of the conduct had financial vulnerability; [4] the conduct involved repeated actions or was an isolated incident; and [5] the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*State Farm*, 538 U.S. at 419. Of these, even "a single factor can provide justification for a substantial award of punitive damages." *Saunders*, 526 F.3d at 153 (citing *Bach v. First Union Nat'l Bank*, 486 F.3d 150, 154, 157 (6th Cir. 2007)).  Here, as the district court found, multiple factors supported the jury's award.

First, Daugherty testified at length about the emotional distress that Ocwen's conduct caused, and this testimony was corroborated by his wife. Thus, as emphasized in *State Farm*, his harm was more than "economic." 538 U.S. at 419. And even without evidence of physical injury (as opposed to emotional injury), the

jury's punitive damages award was sound. As this Court has explained, in the FCRA context the absence of physical injury does not justify remitting an FCRA punitive damage verdict. *See Saunders*, 526 F.3d at 152-53. That is because, although "FCRA violations result in economic and emotional harm," they "will very infrequently cause physical harm or endanger the health and safety of others." *Id.* As a result, "the first and second factors will usually be absent." *Id.* Yet, because Congress "has nonetheless authorized punitive damages in FCRA cases," the "absence of the first or second factors" does not "weigh[] strongly" against a punitive damages award. *Id.*

Moreover, Daugherty's emotional distress was compounded by his financial vulnerability as well as Ocwen's repeated refusal to meaningfully address the credit inaccuracies, demonstrating reprehensibility under the third and fourth *State Farm* factors. Daugherty had a modest income and limited resources compared to Ocwen, and Ocwen's conduct rendered him significantly more vulnerable: By failing to adequately investigate the tradeline inaccuracies and correct them, Ocwen made it more difficult for Daugherty to refinance his mortgage and remain in his home.

What is more, the evidence at trial showed that Ocwen *never* planned on conducting a reasonable investigation into the inaccurate tradeline. It had more than two dozen opportunities to perform a serious investigation but chose not to

because its policy directed employees to look only at the dispute code. The evidence revealed that "Ocwen gave only cursory attention to the many disputes that were submitted regarding … an inaccurate foreclosure entry" and "repeatedly refused to reasonably investigate the Plaintiff's credit disputes," [JA 3314], in violation of section 1681s-2(b)(1)(B) and this Court's standard set forth in *Johnson* and *Saunders*. [JA 2679; 2679-80; 2666; 2678; 2759] The Supreme Court has made clear that "a recidivist may be punished more severely than a first offender" because "repeated misconduct is more reprehensible than an individual instance of malfeasance." *BMW*, 517 U.S. at 577. And this Court has echoed that principle: a company's "intentional misconduct and longstanding refusal to correct its errors are more reprehensible than negligence or a mistake quickly corrected." *Saunders*, 526 F.3d at 153; *see also Williams v. First Advantage LNS Screening Sols., Inc.*, No. 1:13CV222-MW/GRJ, 2017 WL 819486, at *15 (N.D. Fla. Mar. 2, 2017) (upholding $3.3 million verdict in FCRA case with repeated misconduct).

### B.    The punitive damage award must stand to punish and deter Ocwen.

The district court ruled that "restricting a punitive damages verdict to a single digit ratio would not, in the words of the *Saunders II* court, 'serve as a meaningful deterrent' to Ocwen's reprehensible conduct." [JA 3316] Ocwen's bid to overturn this result should be rejected. The Supreme Court has long recognized that greater ratios may comport with due process when reprehensible conduct

results "'in only a small amount of economic damages.'" *Saunders*, 526 F.3d at 154 (citing *State Farm*, 538 U.S. at 425 (quoting *Gore*, 517 U.S. at 582)).[10] And that is especially true where a jury's award is authorized by statute. *Cf. St. Louis, I.M. & S. Rwy. Co. v. Williams*, 251 U.S. 63, 66-67 (1919) (explaining that awards of statutory damages are constitutionally permissible so long as they are not "so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable").

It is this principle—not any mechanical resort to ratios—that governs the analysis of punitive awards in the FCRA context. That is because, "[a]lthough FCRA does place limits on civil penalties when suit is brought by the government, Congress specifically chose not to limit punitive damages in suits brought by private parties." *Saunders*, 526 F.3d at 152 (internal citations omitted). In the course of rejecting a defendant's similar argument that a punitives award was unconstitutional because it exceeded a single-digit ratio, this Court in *Saunders* explained that, "when a jury only awards nominal damages or a small amount of compensatory damages, a punitive damages award may exceed the normal single digit ratio because a smaller amount 'would utterly fail to serve the traditional purposes underlying an award of punitive damages, which are to punish and

---

[10] The Supreme Court noted that when compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003).

deter.'" *Id.* at 154. Indeed, because actual or statutory damages in FRCA cases may be small (i.e., statutory damages are between $100 and $1,000), large ratios are indeed often necessary for punitive damages to have the effects Congress intended in authorizing them. *Id.* (affirming FCRA award with 1:80 ratio).

The district court here heeded this lesson, as have many other courts in this context. *See JCB, Inc. v. Union Planters Bank, NA*, 539 F.3d 862, 876 (8th Cir. 2008) ($108,750.00 in punitive damages awarded with $1 compensatory damages on a trespass claim); *Abner v. Kan. City S. R.R.*, 513 F.3d 154, 165 (5th Cir. 2008) (affirming punitive damages award of $125,000 accompanying nominal damages of $1); *Cummings v. Connell*, 402 F.3d 936, 945 (9th Cir. 2005) (explaining that, "[b]ecause nominal damages do not measure severity of conduct, it is not appropriate to examine the ratio of a nominal damages award to a punitive damages award"); *Kemp v. Am. Tel. & Tel. Co.*, 393 F.3d 1354, 1364-65 (11th Cir. 2004) (allowing $250,000 punitive damages award accompanying compensatory damages of $115.05); *Lee v. Edwards*, 101 F.3d 805, 811 (2d Cir. 1996) (rejecting ratio analysis because "the compensatory award here was nominal, [so] *any* appreciable exemplary award would produce a ratio that would appear excessive by this measure").

Ultimately, despite Ocwen's protestation that it did nothing reprehensible, the jury disagreed and sought to deter Ocwen from repeating its illegal practices.

As the Fourth Circuit noted in *Saunders,* "a punitive damages award must remain of sufficient size to achieve the twin purposes of punishment and deterrence." 526 F.3d at 154-55. Punitive damages are meant to prevent a wrongdoer from making law violations a part of its everyday business practice. And, indeed, the jury here presumably believed that "Ocwen would not change its behavior absent the imposition of significant punitive damages," leaving future homeowners at risk of a similar peril. [JA 3314-15] Yet Ocwen's brief makes clear that even now it does not acknowledge or understand the seriousness of its conduct. The district court's judgment here should be affirmed.

## CONCLUSION

The district court must be affirmed to deter Ocwen from continuing its unlawful policies.

Respectfully submitted,

*/s/ Jed R. Nolan*

| | |
|---|---|
| Deepak Gupta | Jed R. Nolan |
| Matthew W.H. Wessler | Ralph C. Young |
| Rachel S. Bloomekatz | HAMILTON, BURGESS, YOUNG & |
| GUPTA WESSLER PLLC | POLLARD, PLLC |
| 1735 20th Street, NW | P.O. Box 959 |
| Washington, DC 20009 | Fayetteville, WV 25840 |
| (202) 888-1741 | (304) 574-2727 |
| *deepak@guptawessler.com* | *jnolan@hamiltonburgess.com* |

March 24, 2017                                    *Counsel for Plaintiff-Appellee*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 13,320 words, excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14 point Baskerville font.

*/s/ Jed R. Nolan*
Jed R. Nolan
*Counsel for Plaintiff-Appellee*

March 24, 2017

# CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2017, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Fourth Circuit by using the CM/ECF system. All participants are registered CM/ECF users, and will be served by the appellate CM/ECF system.

*/s/ Jed R. Nolan*

Jed R. Nolan
*Counsel for Plaintiff-Appellee*