RECORD NUMBER: 16-2243

# United States Court of Appeals
### *for the*
# Fourth Circuit

DAVID M. DAUGHERTY,

*Plaintiff/Appellee,*

– v. –

OCWEN LOAN SERVICING, LLC,

*Defendant/Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA AT BECKLEY

# REPLY BRIEF OF APPELLANT

MEGAN BURNS
JONATHAN M. KENNEY
JOHN C. LYNCH
JASON E. MANNING
TROUTMAN SANDERS, LLP
222 Central Park Avenue
Suite 2000
Virginia Beach, VA 23462
(757) 687-7500

*Counsel for Appellant*

## **TABLE OF CONTENTS**

Table of Authorities ............................................................................ iii

Introduction ........................................................................................ 1

Counterstatement of Facts................................................................. 4

    A. Ocwen's Obligations Under the FCRA were to Investigate the
        Disputed Information identified by Equifax.................................... 4

    B. Ocwen's Policies and Procedures do not Restrict the Scope of the
        Investigation ................................................................................ 6

    C. Ocwen Conducted a Reasonable Investigation and Responded to
        Daugherty's Disputes.................................................................... 8

        1. Ocwen properly responded to Daugherty's March 2013 dispute,
           which was about a 2012 tradeline ............................................. 8

        2. None of the ACDVs Ocwen received between March 2013 and
           April 2014 disputed the payment status of the account ............ 9

        3. Ocwen properly responded to Daugherty's March 2014 disputes.......... 10

        4. Ocwen responded to the CFPB's inquiries by sending an AUD to
           all CRAs advising them that Daugherty's account was current.............. 11

Argument............................................................................................ 12

    A. The Issue of Willfulness Should Not Have Gone to the Jury ...................... 12

        1. The District Court Erred by Refusing to Decide as a Matter of Law
           that Ocwen's Actions were not Reckless ................................. 12

           a. The District Court was required to address the legal standard
              under Safeco ...................................................................... 12

           b. Ocwen's Policies and Procedures reflect an objectively
              reasonable interpretation of the FCRA ............................... 13

i

    2.  Ocwen's investigation was not reckless ................................... 16

B. The District Court Erred by Refusing to Grant a New Trial or Strike the Punitive Damages Award ...................................................... 20

    1.  Ocwen was unfairly prejudiced by the District Court's refusal to enforce the Scheduling Order and the Federal Rules ............................. 20

    2.  The District Court improperly admitted expert testimony that was not disclosed ............................................................................ 21

    3.  The District Court improperly excluded Lorin Hanks' testimony ......... 23

    4.  The District Court's Admission of Undisclosed Financials was Substantial Error Warranting New Trial or Striking the Punitive Damages Award ....................................................................... 24

D. Ocwen is Entitled to Remittitur of the Constitutionally Excessive Punitive Damages Award ............................................................. 27

    1.  The State Farm Reprehensibility Factors do not Support a $2.5 million Punitive Damages Award ........................................... 27

    2.  A ratio of 408:1 is not justified ............................................. 30

Conclusion ............................................................................... 32

Certificate of Compliance

Certificate of Service

## TABLE OF AUTHORITIES

**Cases**

*Bach v. First Union Nat'l Bank*,
149 Fed. Appx. 354 (6th Cir. 2005) (*Bach I*) ................................... 28, 29, 30

*Bach v. First Union Nat'l Bank*,
486 F.3d 150 (6th Cir. 2007) (*Bach II*).................................................. 28, 30

*Boyd v. Wells Fargo Bank, N.A.*,
2016 U.S. Dist. LEXIS 172965 (S.D. Ga. Dec. 14, 2016) ......................... 14

*Chiang v. Verizon New England Inc.*,
595 F.3d 26 (1st Cir. 2010)....................................................................... 19

*Grossman v. Barclays Bank Delaware*,
2014 U.S. Dist. LEXIS 20149 (D.N.J. Feb. 19, 2014)............................... 15

*Hinkle v. Midland Credit Mgmt., Inc.*,
827 F.3d 1295 (11th Cir. 2016) ................................................................. 14

*JCB v. Union Planters Bank*,
539 F.3d 862 (8th Cir. 2008) .................................................................... 31

*Johnson v. MBNA America Bank, N.A.*,
357 F.3d 426 (4th Cir. 2004) ....................................................... 3, 5, 13, 14

*Klonoski v. Mahbab*,
156 F.3d 255 (1st Cir. 1998)...................................................................... 24

*Krajewski v. American Honda Finance Corp.*,
557 F. Supp.2d 596 (E.D. Pa. 2008)........................................................... 13

*Lee v. Edwards*,
101 F.3d 805 (2d Cir. 1996) ...................................................................... 31

*Levine v. World Fin. Network Nat'l Bank*,
554 F.3d 1314 (11th Cir. 2009) ................................................................. 16

*Lindsey v. Experian Info. Sols., Inc.*,
    2017 U.S. Dist. LEXIS 12708 (N.D. Ala. Jan. 31, 2017) ............................ 16

*Matson v. Edfinanical Services, LLC*,
    2015 U.S. Dist. LEXIS 111053 (E.D. Wis. Aug. 21, 2015)......................... 18

*McDonald v. OneWest Bank, FSB*,
    2013 U.S. Dist. LEXIS 31787 (W.D. Wash. March 7, 2013)...................... 14

*Palouian v. FIA Card Servs.*,
    2013 U.S. Dist. LEXIS 61861 (E.D. Pa. Apr. 29, 2013).............................. 23

*Rogers v. JP Morgan Chase Bank, N.A.*,
    2012 U.S. Dist. LEXIS 82817 (W.D. Wash. June 13, 2012)....................... 15

*Safeco Ins. Co. of Am. v. Burr*,
    551 U.S. 47 (2007)..................................................................................... 12

*Saunders v. Branch Banking & Trust Co. of Va.*,
    526 F.3d 142 (4th Cir. 2008) ............................................................. passim

*Saunders v. Equifax Info. Servs., LLC*,
    2006 U.S. Dist. LEXIS 71976 (E.D. Va. Oct. 3, 2006) .............................. 15

*State Farm Mut. Auto Ins. Co. v. Campbell*,
    538 U.S. 408 (2003)........................................................................ 27, 28, 32

*TXO Prod. Corp. v. All Res. Corp.*,
    509 U.S. 443 (1993)..................................................................................... 25

*Watson v. Citi Corp.*,
    2008 U.S. Dist. LEXIS 78813 (S.D. Ohio Sept. 5, 2005)........................... 15

*Williams v. First Advantage LNS Screening Solutions, Inc.*,
    2017 U.S. Dist. LEXIS 29688 (N.D. Fla. March 2, 2017).................... 31, 32

**Rules and Statutes**

15 U.S.C. § 1681e(b) ................................................................................... 6

iv

15 U.S.C. § 1681i(a) ................................................................ 5, 6

15 U.S.C. 1681s-2(a)(1) .............................................................. 4

15 U.S.C. § 1681s-2(a)(8) ........................................................... 23

15 U.S.C. § 1681s-2(a)(8)(F)(i)(I) ............................................ 19, 23

15 U.S.C. § 1681s-2(b) ............................................................. 23

15 U.S.C. 1681s-2(b)(1) ............................................................. 5

15 U.S.C. § 1681s2(b)(1)(A) ....................................................... 12

15 U.S.C. § 1691i(a)(2) .............................................................. 5

Fed. R. Civ. P. 26(a)(3) ............................................................ 20

Fed. R. Civ. P. 37(c)(1) ............................................................ 20

Fed. R. Evid. 702(a) ................................................................ 22

## <u>INTRODUCTION</u>

Plaintiff-Appellee David M. Daugherty's ("Daugherty") argument takes place in an alternate universe, one in which his problems would have vanished had Ocwen Loan Servicing, LLC ("Ocwen") simply told Equifax *2* more times that it was reporting his account as current.  Consider the real facts.  Of the 24 ACDVs Daugherty argued were "verified" by Ocwen without reasonable investigation, only 12 addressed the offending duplicate tradeline.  Of those 12 ACDVs, 8 disputed the account as "not his" and were correct (it was his account).  Of the remaining 4, disputing "account status, payment rating, and payment history," Ocwen investigated and responded to 2, correcting the account to "current."  Given the undisputed evidence that Ocwen's policy is to investigate all information *relevant to the dispute* and Ocwen did *in fact* access all documents available in REALServicing, the Vault, and Radar to investigate the disputes identified in the ACDVs, *two* imperfect responses cannot, as a matter of law, be "willful" or support a multimillion dollar punitive damages verdict.  **2 out of 24 + an objectively reasonable, implemented policy ≠ $2.5M.**

Daugherty's version of the facts deliberately ignores the elephant in the room—the undisputed fact that *Equifax* created the duplicate tradeline that was the focus of Daugherty's dispute.  Daugherty concedes that:

- Ocwen *never* reported a second tradeline;

1

- Ocwen *always* furnished accurate information;

- Equifax *on its own* reported Daugherty late even though Ocwen reported him current;

- Daugherty *never* told Ocwen that Equifax was reporting two tradelines for his account;

- Ocwen investigated and corrected the 106 dispute *three* times, including by AUD to all credit reporting agencies ("CRAs");

- Nevertheless, Equifax *still* did not correct or delete the duplicate tradeline until after he filed suit, despite *Equifax's own policy* to delete any duplicate tradeline.

In reality, Daugherty's dispute was not that Ocwen failed to investigate and report the account as current. Ocwen *repeatedly* did so. His real dispute was that *Equifax* was reporting two tradelines, one of which was incorrect. But there was no way for Ocwen to discover this because Daugherty *never* told Ocwen, including in his direct communications to Ocwen.

To prove a reckless violation of the Fair Credit Reporting Act ("FCRA"), Daugherty must do more than point to mistakes Ocwen made. He must show that Ocwen's policies and procedures ran an unjustifiably high risk of violating the FCRA. At trial, Daugherty's contention was that Ocwen willfully violated the FCRA because it failed to investigate *everything* on *every* ACDV. Now, realizing

that *the FCRA does not require any such thing*, Daugherty changes course. Instead, he says that Ocwen's policies were reckless because they require a "cursory" data conformity review (*i.e.* merely checking the disputed ACDV fields against the same fields furnished in monthly data reports, *see Johnson v. MBNA America Bank, N.A.*, 357 F.3d 426, 431 (4th Cir. 2004)). But Daugherty can make that argument only by ignoring the facts and distorting the trial record.

The undisputed evidence shows that Ocwen's policies require investigation of the disputed information by accessing *all* necessary records, including source documents and correspondence. Had the District Court properly addressed this issue—whether Ocwen's policies and procedures reflect an objectively reasonable interpretation of the FCRA—it could *only* have decided, as a matter of law, that Ocwen's procedures are objectively reasonable. Applying the controlling legal standard, Ocwen's investigation in this case was not reckless. There is no evidence that Ocwen failed to look at Daugherty's correspondence during its investigations. Regardless, nothing in those communications would have alerted Ocwen to Daugherty's real dispute—the duplicate tradeline, which Ocwen *never* furnished. As a matter of law, this cannot be willfulness.

That the jury awarded $2.5 million in punitive damages based on two oversights is the direct result of the District Court's failure to apply controlling precedent or enforce the Federal Rules as to Daugherty. Instead, the court refused

to address Ocwen's policy and the complete lack of any evidence of willfulness, and permitted Daugherty to introduce evidence he never disclosed, including the wholly improper expert opinion that Ocwen caused the inaccurate tradeline to remain on Daugherty's credit report by "verifying" it. The court's decision, at the very end of trial, to allow Daugherty to ambush Ocwen with *misrepresented* financial documents that were *not* Ocwen's was outcome determinative. The jury's willfulness verdict and punitive damages award cannot stand. Even ignoring the record and the controlling legal standard, the punitive damages award – at an outrageous 408:1 ratio – must be drastically remitted.

## COUNTER STATEMENT OF THE FACTS

Ocwen provides this brief counter-statement to clarify that the facts do not support Daugherty's contention that Ocwen's policy was to conduct a "cursory" investigation and, in any event, Daugherty's letters did not alert Ocwen of his real dispute – Equifax was reporting a duplicate tradeline.

**A.    Ocwen's Obligations Under the FCRA were to Investigate the Disputed Information identified by Equifax.**

Under the Fair Credit Reporting Act ("FCRA"), a furnisher's obligation is *furnish* accurate information, not – as Daugherty suggests – to ensure the accuracy of any and all information reported by a CRA, regardless of source (Opp., 5-6.)  15 U.S.C. 1681s-2(a)(1).  The statute reinforces this proposition by imposing an investigatory requirement triggered when the furnisher receives notice from a CRA

4

of a dispute with regard to the completeness or accuracy of information the furnisher provided to a CRA.    15 U.S.C. 1681s-2(b)(1).    Thus, a furnisher's obligation is to investigate a consumer's dispute about "information *provided by a [furnisher]* to a consumer reporting agency," *id.* (emphasis added), not to "conduct a reasonable investigation as to the accuracy and completeness of the relevant information."  (Opp., 6.)

The term "relevant information" does not, as Daugherty apparently believes, refer to all the information on the ACDV.  (JA 3146, 3150.)  Instead, the FCRA requires the CRA to provide all "relevant information *regarding the dispute that the agency has received from the consumer*."  15 U.S.C. § 1691i(a)(2) (emphasis added).  In conducting its investigation into the accuracy of the information it furnished to Equifax, Ocwen was required to review the information Equifax received *from* Daugherty and Aggressive Credit Repair ("ACR"), as well as information in its own records relevant to the dispute.[1]  *Johnson,* 357 F.2d at 429.  The FCRA does **not** require Ocwen to divine that the problem was a duplicate tradeline, particularly without "relevant information" from the consumer that

_____

[1] The information on an ACDV is everything that appears in the tradeline; it is not limited to the disputed information.   (JA 2788.)  The CRA assigns a dispute code based on the nature of the consumer's dispute.   The CRA is statutorily obligated to provide the "relevant information" it receives from the consumer about the dispute to the furnisher.  15 U.S.C. § 1681i(a).

Equifax was reporting two different tradelines for the same account. Instead, the FCRA places this burden on Equifax. 15 U.S.C. § 1681e(b), § 1681i(a).

## B. Ocwen's Policies and Procedures do not Restrict the Scope of the Investigation.

Daugherty seeks to convince this Court that Ocwen's policies require a "superficial" investigation "limited to the dispute code" that took seconds to perform. But his argument ignores the unrebutted testimony from Ocwen's corporate witness that credit analysts are trained to respond to a consumer's indirect dispute by conducting an investigation accessing all the documentation available in Ocwen's systems, including payment information and correspondence from the borrower stored in REALServicing, and source documents and correspondence, stored in the Vault. (JA 2777, 2779, 2782, 2795-97, 2808.) The credit analyst completes the investigation and responds via e-Oscar *before* the credit analyst logs into REALServicing to enter the codes for "received" and "completed" that appear on the transaction log. (JA 2776, 2780-83, 2807-08.) There is no evidence that it took 5 seconds to complete an investigation. (Opp., 9; 2803-04, 2807-08, 2819-20, 2821.) An analyst cannot even log into REALServicing in 5 seconds. (JA 2853, 2856.) Despite repeated badgering by Daugherty's counsel on this issue, Ms. Lyew never wavered from her testimony that credit analysts are required to conduct a thorough investigation that may take days or weeks, not seconds. (JA 2852-58, 2860.)

Daugherty isolates Ms. Lyew's testimony that Ocwen's investigation was "superficial." (Opp., 15.) Taken in context, however, it is evident that the witness was confused about the meaning of "superficial." Indeed, just prior to the testimony Daugherty cites, Ms. Lyew testified that Ocwen did what it was "supposed to do," which is to conduct "superficial, reasonable investigation." (JA 2837.) Plainly, her testimony was that Ocwen conducted a reasonable investigation; she did not understand counsel's use of the word "superficial." (JA 2876 (Ocwen's investigations were not superficial). As noted above, Ms. Lyew testified at length that Ocwen's policy is to conduct an investigation of all the information in Ocwen's systems, not a "superficial" investigation.

Finally, Ms. Lyew's testimony that the investigation was "limited to the dispute code" refers to Ocwen's policy of investigating the disputed information – exactly what the statute and this Court require. She repeatedly testified that Ocwen investigates its records relevant to the dispute, as identified by the dispute code assigned by the CRA to describe the nature of the dispute, including correspondence from the consumer. (JA 2795-97, 2877-78.) Despite Daugherty's efforts to trick the witness, there is no evidence that Ocwen limits the information it researches when investigating the dispute.[2]

---

[2] The FCRA requires investigation of the disputed information, not something else. The purpose of the dispute code is to identify the nature of the dispute so that the furnisher knows what to investigate. (JA 3005.) Daugherty

**C.    Ocwen Conducted a Reasonable Investigation and Responded to Daugherty's Disputes.**

In early 2012, Equifax created a duplicate tradeline for Daugherty's Ocwen account.  On its own, Equifax then inexplicably reported the duplicate tradeline as late for several months in 2013.  None of the ACDVs or correspondence from Daugherty ever advised Ocwen that Daugherty's real dispute was that Equifax was reporting two tradelines.

### 1.    Ocwen properly responded to Daugherty's March 2013 dispute, which was about a 2012 tradeline.

Realizing that his credit was bad for a number of reasons, Daugherty hired ACR in March 2013. (JA 2239-40, 2329-32.) He also wrote to Ocwen complaining about his Equifax report, which "states I am currently behind $6,129.00" and "in foreclosure." (JA. 3400-01.) Contrary to Daugherty's assertions, the letter itself does not identify the tradeline or a date.  Attached to the letter is part of a credit report from 2012, *not* 2013:



(JA 3401.)

---

says he is not arguing that Ocwen was required to "investigate everything," so he must concede that Ocwen was required to investigate only the dispute identified by the dispute code.  That is exactly Ms. Lyew's testimony.

Daugherty concedes the letter appears to be inquiring about a 2012 credit report. Ocwen did not "ignore[] the request." (Opp., 7.) Instead, it responded to tell Daugherty that the 2012 reporting was correct, the foreclosure had been halted and his account was current. (JA 3402-03.) Tellingly, Daugherty did not write or call to clarify that he was talking about a 2013 credit report. Ocwen heard nothing further from Daugherty directly until a year later, in March 2014. (JA 2249, 2353.) Daugherty failed to mention the March 2013 dispute in his letter to the CFPB (JA 3407) or in the Complaint (JA 28).

## 2.  None of the ACDVs Ocwen received between March 2013 and April 2014 disputed the payment status of the account.

In the meantime, ACR began sending letters that resulted in additional ACDVs – each disputing the account as "not his/hers." (JA 2353, JA 3426-53.) Daugherty apparently contends that Ocwen should not have investigated whether the account belonged to him, but instead should have investigated an entirely different dispute. (Opp., 10.) But Daugherty's March 2013 letter disputed a *2012* tradeline, which indisputably was correct. The letter had no information relevant to Daugherty's dispute that the account was "not his," and certainly nothing that would have alerted Ocwen to the fact that Equifax was reporting the account twice. Ocwen did not "confirm[] the inaccurate information." (Opp., 10.) Ocwen's response to Equifax verified *only* that the account belonged to Daugherty. (JA

9

2934.)  Ocwen did not receive another dispute about the payment status (007/106) on the account until April 2014.

### 3.    Ocwen properly responded to Daugherty's March 2014 disputes.

By March 2014, Equifax inexplicably was reporting the duplicate tradeline to show Daugherty late several times in 2013, even though Ocwen reported him current.  Discovering as much, Daugherty sent a letter to Ocwen complaining that Equifax was showing his account as 120 days late in the months of June, July, October and December 2013.   (JA 3405.)   The tradeline did not show a foreclosure.  (JA 3406.)  The letter did not tell Ocwen that the tradeline appeared twice on Equifax's reports.

Ocwen also responded to an ACDV on April 24, 2014, modifying the account to reflect that it was current, with a zero balance past due, modifying the payment history profile, and verifying that the payment rating should be blank because Daugherty was current. (JA 3618-19.)   Daugherty does not claim the modifications in the ACDV response were inaccurate. The letters in Ocwen's possession relating to the March 2014 dispute do not mention a foreclosure. Instead, their focus is on the late payment reporting for several months in 2013 (created by Equifax). (JA 3356-63.)  Ocwen corrected this exact information, but Equifax failed to correct or remove the tradeline.  (JA 3618-19.)

**4.    Ocwen responded to the CFPB's inquiries by sending an AUD to all CRAs advising them that Daugherty's account was current.**

On June 9, 2014, during a phone call, Daugherty repeated his concerns about the late reporting for several months in 2013.  (JA 3602.)  On June 20th, Ocwen responded to another ACDV with a 007/106 dispute code.   Again, Ocwen responded by indicating the account was "current," with a past due balance of $0, and updating the payment history profile – all of which Daugherty agrees is accurate.  (JA 3628-29.)  This ACDV did not identify the account as in foreclosure. *Id.* Again, Equifax failed to correct any of the information on the duplicate tradeline.

On June 26th, the CFPB asked Ocwen whether Plaintiff was late in March, June, July, October and December 2013.   (JA 3606-07.)    Ocwen provided a payment reconciliation history showing that Daugherty was current in 2013.  *Id.* On July 2, 2014, Ocwen sent an AUD to all CRAs showing Plaintiff as current for all of 2013, not in foreclosure, and the account with a zero balance.  (JA 3383.) Nevertheless, Equifax *still* failed to correct the tradeline or delete it.  The evidence shows that Daugherty's credit problems were not the result of Ocwen's alleged failure to tell Equifax enough times the account was current.  If anyone caused inaccuracies to "haunt" Daugherty's credit report (Opp., 13), it was Equifax, the party that created the duplicate tradeline, reported Daugherty's account as late in 2013, and repeatedly failed to correct or remove it.

11

# ARGUMENT

**A.    The Issue of Willfulness Should Not Have Gone to the Jury.**

**1.    The District Court Erred by Refusing to Decide as a Matter of Law that Ocwen's Actions were not Reckless**

*a.    The District Court was required to address the legal standard under Safeco*

Everyone agrees that the FCRA requires Ocwen to conduct an investigation into the "disputed information." 15 U.S.C. § 1681s2(b)(1)(A). But the parties disagree about what this means. Under the first prong of *Safeco*, before Daugherty's recklessness claim could go to the jury, the District Court was required to make a legal determination that Ocwen's interpretation of the FCRA was objectively unreasonable.[3] *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 70 n.20 (2007). In an effort to sidestep the implications of *Safeco*, Daugherty now claims that he is not arguing that Ocwen was required to "investigate everything" or to "diagnose" the problem. (Opp., 32.) Not only does trial record contradict this assertion, but the practical result of adopting Daugherty's arguments is the same.

During closing arguments, Daugherty repeatedly told the jury that Ocwen was required to "look at everything," at "all the lines of data they get" on the

---

[3] Contrary to Daugherty's assertion, the District Court did not address this issue until trial, initially failing to discuss it at all and then refusing to hear Ocwen's arguments. (JA 1421-23, 1786.)

ACDV, at "all the relevant information from Equifax" and that the investigation is "not limited to the dispute code."  (JA 3146, 3150, 3178-79.)   Daugherty's expert also testified that Ocwen was required to "figure out what's the cause of the dispute."  (JA 2550.)   Daugherty's argument plainly was that the FCRA requires Ocwen to investigate everything (what he calls "all relevant information") on the ACDV and diagnose the dispute.  Likewise, in his Brief, Daugherty contends that Ocwen was required to investigate something other than the disputed information. (Opp., 33-34.)  In other words, according to Daugherty, because Ocwen had letters in its file from him, it was required to ignore the disputes identified in the ACDVs and instead divine his real dispute from the contents of the letters.  (Opp., 33.) That is not the legal standard; the FCRA and relevant case law require an investigation of the dispute identified by the CRA.   The District Court was required to resolve this issue as a matter of law.

### b. Ocwen's Policies and Procedures reflect an objectively reasonable interpretation of the FCRA.

Ocwen's policy is to investigate the disputed information identified by the CRA in the ACDV, which is what the FCRA requires.  (JA 2877-78.)  *See Johnson*, 357 F.3d at 431 (furnisher must investigate the dispute reported by the CRA); *Krajewski v. American Honda Finance Corp.*, 557 F. Supp.2d 596, 610 (E.D. Pa. 2008) (investigation is directed to dispute identified by the CRA). Contrary to Daugherty's assertions, Ocwen's policy is not limited to investigating

the "dispute code" – in other words, to confirming that the disputed information matches that previously provided by Ocwen.  *E.g.*, *McDonald v. OneWest Bank, FSB*, 2013 U.S. Dist. LEXIS 31787, *14 (W.D. Wash. March 7, 2013) (investigation not reasonable when it compared points of data provided by CRA with its own computer records without accessing plaintiff's file); *Johnson*, 357 F.3d at 431 (MBNA looked only at computer records and failed to access underlying loan documents); *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1305 (11th Cir. 2016) (failure to consult account level documentation).  Instead, Ocwen's employees are trained to access all documents necessary to verify the *disputed information*.  That is all that the FCRA requires of a furnisher.  *Hinkle*, 827 F.3d at 1303; *Boyd v. Wells Fargo Bank, N.A.*, 2016 U.S. Dist. LEXIS 172965, *16-17 (S.D. Ga. Dec. 14, 2016).

Moreover, Ocwen's policy is to review all information in its files that is relevant to the dispute, including the consumer's correspondence and the transaction log (in REALServicing).   (JA 2777, 2779, 2782, 2795-97, 2808.)  The FCRA does not – as Daugherty suggests – require Ocwen to investigate something other than the dispute identified by the CRA.  *Hinkle*, 827 F.3d at 1306 (often it will be reasonable for furnisher to review additional *dispute related* information beyond the information provided by the CRA).  The cases he cites stand only for the proposition that a furnisher is required to review all information in its records

14

*relevant to the dispute* – including correspondence. *See, e.g., Rogers v. JP Morgan Chase Bank, N.A.*, 2012 U.S. Dist. LEXIS 82817, (W.D. Wash. June 13, 2012) (question of fact whether investigation was reasonable when notice of dispute identified dispute as "not responsible" for fraudulent activity and furnisher failed to review record indicating consumer disputed suspected fraudulent activity designation on account); *Watson v. Citi Corp.*, 2008 U.S. Dist. LEXIS 78813, *26-27 (S.D. Ohio Sept. 5, 2005) (dispute was that account balance was zero and furnisher failed to review records showing it settled the account); *Saunders v. Equifax Info. Servs.*, LLC, 2006 U.S. Dist. LEXIS 71976 (E.D. Va. Oct. 3, 2006) (failure to review account history when dispute was that account reporting was inaccurate). They do not require a furnisher to investigate something else or to divine the consumer's actual dispute.

The consumer is supposed to tell the CRA what he is disputing precisely so that the furnisher doesn't have to "figure it out" or "investigate everything" on the ACDV.[4] *Grossman v. Barclays Bank Delaware*, 2014 U.S. Dist. LEXIS 20149, *32 (D.N.J. Feb. 19, 2014) (no requirement to discover the dispute). After reviewing the information provided by the consumer about the dispute (the "relevant information"), the CRA assigns a dispute code that identifies the nature

---

[4] Adopting Daugherty's argument would provide an end run around the FCRA's statutory scheme – essentially providing a private cause of action against a furnisher for failing to investigate a direct dispute.

15

of the dispute and, if necessary, provides more information in the "FCRA relevant information field." The case law simply provides that the furnisher must review *all* of its records that are relevant to the dispute – including correspondence from the consumer.

This is Ocwen's policy, which is objectively reasonable as a matter of law. To the extent that this Court reaches a different conclusion, at the very least Ocwen's interpretation of what the statute requires is an objectively reasonable one based on the text of the statute and the case law interpreting it. *Safeco*, 551 U.S. at 70. Accordingly, Ocwen cannot be liable for a willful violation of the FCRA. *Levine v. World Fin. Network Nat'l Bank*, 554 F.3d 1314 (11th Cir. 2009) (subjective bad faith cannot support a willfulness finding when defendant's reading of the statute is objectively reasonable); *Lindsey v. Experian Info. Sols., Inc.*, 2017 U.S. Dist. LEXIS 12708, at *13 (N.D. Ala. Jan. 31, 2017) (objective unreasonableness is a high standard).

### 2. <u>Ocwen's investigation was not reckless.</u>

Daugherty insists that the evidence is "overwhelming" that Ocwen acted recklessly (Opp., 38), but that is true only in Daugherty's alternate universe. First, as discussed (*supra*, ¶ II (B)), there is no evidence that Ocwen's investigations were cursory or took only "seconds" to complete. (Opp., 39.) Daugherty claims the "only evidence" regarding the time it took to conduct the investigations is

found on the transaction log. *Id.* But he ignores Ms. Lyew's unchallenged testimony that the transaction log *does not* show the amount of time it takes to investigate a dispute. (JA 2803-04, 2807-08, 2819-20, 2821.) The evidence instead shows that Ocwen's policy is to require credit analysts to access the underlying documents and information necessary to verify the disputed information – a process that cannot occur in seconds. (JA 2853, 2856.)

Next, Daugherty claims that Ocwen was reckless because it had a policy to ignore Daugherty's direct communications. (Opp., 39.) Once again, there is no evidence to support this proposition. On the contrary, Ms. Lyew testified repeatedly that Ocwen's policy and practice is to research *all* documents and information relevant to the dispute. (JA 2777, 2779, 2782, 2795-97, 2808.) Daugherty's correspondence was available in REALServicing and the Vault and there was no testimony that Ocwen failed to review it when researching the 007/106 disputes – the only disputes to which it was relevant. Ocwen was not required to review Daugherty's correspondence about a *201*2 tradeline or late payments in 2013 when he disputed that the account was "not his"; it would not in any event have supported a claim that the account was not his, let alone alerted Ocwen to the real dispute – that Equifax was reporting a duplicate tradeline.

Even if Ocwen had failed to review the correspondence when researching the payment status disputes it received in April and June 2014, that failure was

17

contrary to Ocwen's policy and cannot support a finding of recklessness. Indeed, in *Rogers*, the court held that Chase's actions in failing to incorporate consumer correspondence into its investigation was *not willful*. 2012 U.S. Dist. LEXIS 82817, *35 (granting summary judgment); *see Matson v. Edfinancial Services, LLC*, 2015 U.S. Dist. LEXIS 111053, *24-25 (E.D. Wis. Aug. 21, 2015) (where Edfinancial had a policy to review underlying documents, fact that employee made a mistake by not reviewing a letter was not evidence of willfulness). Thus, Ocwen's failure to correct one field on two ACDVs is – at most – evidence of negligence.[5]

Finally, the CFPBs investigation alerted Ocwen to nothing more than Daugherty's direct dispute in March 2014. It did not identify a "myriad" of problems with the tradeline, let alone alert Ocwen to the fact that *Equifax* was reporting Daugherty late in months when Ocwen reported him current. Nevertheless, Ocwen sent an AUD modifying *all* fields to show Daugherty current, not in foreclosure and not past due for *any* month in 2013. Daugherty does not complain that there was anything wrong with the corrections in the AUD. Instead, his complaint is that Equifax *still* did not correct the tradeline. (Opp., 40.) By mid-July, Daugherty had filed this suit and Ocwen had investigated and reported

---

[5] Likewise, Ocwen's failure to respond to the March 2013 ACDV – despite a clear policy to investigate and respond to all disputes – may be negligent, but it cannot support a finding of willfulness. There is no evidence it was anything other than a mistake.

the account current no less than three times.  It was under no obligation to reinvestigate yet again. 15 U.S.C. § 1681s-2(a)(8)(F)(i)(I).[6]

Daugherty's entire argument is premised on the notion that his credit problem was caused by Ocwen's failure to tell Equifax two more times that the account was current.  But the facts show that Daugherty's *real* dispute was that Equifax was reporting an incorrect second tradeline – a dispute he *never* communicated to Ocwen.  Ocwen could not have discovered the real dispute from Daugherty's correspondence and Equifax never was going to correct the problem until someone identified the real dispute. (JA 2942-43.)  That did not occur until after Daugherty sued.  Not only is there no evidence that Ocwen's policies pose an unjustifiably high risk of violating the FCRA, there also is no evidence that Ocwen ever reported inaccurate information or caused the duplicate tradeline to remain on Daugherty's report.  *See Chiang v. Verizon New England Inc.*, 595 F.3d 26 (1st Cir. 2010) (plaintiff must show causal relationship between the allegedly unreasonable investigation and the failure to discover and correct inaccuracy in his credit report).

---

[6]Only 2 of Ocwen's responses were imperfect, but 2 instances out of 24 – despite Ocwen's policy and practice – show at most negligence, not a reckless disregard for Daugherty's rights under the FCRA.

19

**B.      The District Court Erred by Refusing to Grant a New Trial or Strike the Punitive Damages Award.**

**1.      Ocwen was unfairly prejudiced by the District Court's refusal to enforce the Scheduling Order and the Federal Rules.**

Daugherty admits that the Equifax ACDVs were not disclosed in his Rule 26(a)(3) disclosures.  He concedes that the Court's Scheduling Order informed him that untimely disclosures "**WILL BE EXCLUDED FROM EVIDENCE**." (JA 37.)  Nor does he dispute the language of the Federal Rules that a party who fails to "provide information or identify a witness as required by Rule 26(a)" will *not* be "allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1) (emphasis added).  And he has no excuse for his failure to disclose the exhibits.

Nevertheless, Daugherty argues Ocwen was not prejudiced because Ocwen knew the documents existed and they were used in depositions.  (Opp., 41-42.) This argument ignores the fact that Ocwen prepared its case relying on the court's order and the Federal Rules for the understanding that Daugherty would not be permitted to introduce the documents without a witness to authenticate them or overcome hearsay.  Despite having months to do so, Daugherty failed to take the deposition of an Equifax representative within the deadline – instead waiting until just days before the trial to disclose the documents and seek a deposition.

Daugherty cannot plausibly contend that Ocwen was not unfairly surprised by the last minute deposition and prejudiced by the introduction of evidence it justifiably believed would be excluded.

Daugherty also insists that admitting the documents was proper because "Ocwen did not produce its copies of the ACDVs." (Opp., at 42.) But Daugherty never sought to compel production of the documents. It was Daugherty's obligation to seek, and identify, the documents if he sought to use them at trial. It was not Ocwen's job to prepare Daugherty's case for him.[7] Daugherty should not be rewarded for failing to follow the Federal Rules and the Scheduling Order.

### 2.  <u>The District Court improperly admitted expert testimony that was not disclosed.</u>

Daugherty insists that the District Court properly determined that Hendricks' opinions were disclosed in his report. But although Hendricks' report generally refers to all documents produced by Equifax (JA 121), it does not discuss any specific ACDV response. Instead, Hendricks points to two Equifax ACDVs in support of his opinion that Ocwen was furnishing two accounts. (JA 91.) But the facts in this case are indisputable that Ocwen was *not* furnishing two accounts.[8] Notably *absent* from the report is any opinion that 1) Ocwen was required to

---

[7] There is no evidence that Ocwen had copies of its ACDVs that it could produce. (JA 2828.)

[8] No amount of investigation would have enabled Ocwen to discover it was reporting two tradelines because Ocwen *was not*.

investigate everything on the ACDV, 2) Ocwen was required to diagnose the cause of the dispute, 3) anything not modified on the ACDV is "verified" by the response, and 4) Ocwen "caused" the duplicate tradeline to remain on Daugherty's credit report.

Daugherty is simply wrong when he argues that Hendricks' testimony about the 007 code was not an opinion. (Opp., 44) (contending the all encompassing nature of the 0007 code is "evident"). Daugherty purported to qualify Hendricks as an expert on the FCRA, including what the dispute codes included on the ACDVs meant. This is not information within the possession of jurors and plainly was offered to assist the jury in understanding what the codes meant. Fed. R. Evid. 702(a). The average person does not know what a tradeline is, let alone a payment history profile. And contrary to Daugherty's contention, this opinion is nowhere to be found in Hendricks' report, which does not mention the 007 code.

Moreover, Daugherty does not even try to argue that Hendricks ever expressed an opinion that Ocwen "verified" information that was not disputed and thereby "caused" the duplicate tradeline to remain on Daugherty's account. He concedes this point, because he must. Together with the District Court's error in failing to interpret the statute at the outset, Hendricks' undisclosed testimony unquestionably prejudiced the jury against Ocwen on willfulness.

### 3.     <u>The District Court improperly excluded Lorin Hanks' testimony</u>

Daugherty parrots the District Court's finding that the ACR letters and Lorin Hanks' testimony were properly excluded because the letters were not provided to Ocwen and they could not have impacted whether Ocwen acted reasonably. (Opp., 45.) This argument continues to ignore the fact that Equifax was statutorily required to provide all relevant information – *i.e.*, the ACR letters – to Ocwen. 15 U.S.C. 1681i(a)(2). In nearly every instance the information *about the dispute* came from ACR. Equifax acted as a conduit, assigning a dispute code *based on the information in the ACR letters*, and passing that to Ocwen. If it hadn't, Ocwen would have had no way to know what to investigate. The contents of the ACR letters and Lorin Hanks' testimony about them are relevant to the crux of this case – the "disputed information." Only by knowing what was "disputed" is it possible to determine whether Owen complied with its FCRA obligations.

Daugherty also contends that Ocwen cannot argue that the ACR generated disputes were frivolous because Ocwen investigated each dispute. (Opp., 46.) But the fact that Ocwen chose to over-comply does not mean it waived its right to rely on the defense provided by 15 U.S.C. § 1681s-2(a)(8)(F)(i)(I). Daugherty does not dispute that it is *relevant* – in determining whether a furnisher has violated § 1681s-2(b) – to consider § 1681s-2(a)(8) and whether the dispute was frivolous or irrelevant. *Palouian v. FIA Card Servs.*, 2013 U.S. Dist. LEXIS 61861, 9-10 (E.D.

23

Pa. Apr. 29, 2013). The District Court committed a substantial and prejudicial error by preventing Ocwen from showing the jury the basis of Daugherty's disputes and the redundant and frivolous nature of them.

4. **The District Court's Admission of Undisclosed Financials was Substantial Error Warranting New Trial or Striking the Punitive Damages Award.**

Despite the fact that they were publically available, Daugherty admittedly never disclosed that he intended introduce OFC's financials at trial. He now attempts to justify this failure on the grounds that it was Ocwen's fault for failing to produce documents or a witness for him. (Opp., 46-47.) Once again, Plaintiff mischaracterizes his efforts and compliance with the Federal Rules and – in a fit of Monday-morning quarterbacking – tries to shift the blame to Ocwen.

It was Daugherty's obligation to prepare his case by moving to compel production of the documents or testimony – and subpoena a witness – if *he* believed it necessary. *Klonoski v. Mahbab*, 156 F.3d 255, 271 (1st Cir. 1998) (rules of discovery and court orders would be empty phrases signifying nothing if documents are allowed into evidence after trial starts solely because not obtained sooner). Instead, Daugherty decided to circumvent the Federal Rules and the Scheduling Order and – realizing at the last minute that he had no financial information – download and then introduce a document that neither the court nor opposing counsel had ever seen before and that they were not given meaningful

opportunity to examine.[9]  A litigant cannot be permitted to ignore the Rules, download a 150-page document from the Internet, and lie in wait for an opportunity to ambush the opposing party with the document.

Further, the fact that the financials were those of Ocwen's parent does not mean that they automatically were admissible.  The issue in *TXO Prod. Corp. v. All Res. Corp.*, 509 U.S. 443, 451 n.9 (1993) is precisely *not* the issue in this case.  Here, Daugherty not only introduced *undisclosed* exhibits in support of his punitive damages argument, he did not employ an expert witness to analyze the documents and provide a reasoned estimate regarding Ocwen's net worth.  Instead, he misrepresented the document to the Court and the jury as *Ocwen's* financial statement, and pointed out the assets and cash on hand, rather than a true net worth figure.  By ambushing Ocwen with the surprise exhibit, Daugherty prevented Ocwen from obtaining an expert to rebut his argument to the jury that the penalty must "sting" the "$7 billion corporation." (JA 3210.)

The OFC financial documents were the ***only*** evidence the jury had to consider on the issue of punitive damages.  Faced with the District Court's decision to admit the documents over its objections, Ocwen had no choice but to try to rebut Daugherty's closing argument, on the fly, to the best of its ability.

---

[9] Contrary to Daugherty's argument, it was far from clear that the trial was bifurcated to the extent that additional evidence would be presented on punitive damages – especially because Daugherty did not disclose any such evidence in his pretrial disclosures or on his exhibit list.

Ocwen's decision to do so cannot be grounds for justifying the admission of the documents. It is plain that the jury based its award on these documents. Their admission could not be more prejudicial to Ocwen and resulted in a miscarriage of justice.

Finally, Daugherty argues that the District Court properly denied Ocwen's Rule 60(b) Motion because there was no misconduct and Daugherty did not misrepresent the contents of the documents. (Opp., 49.) Nothing could be further from the truth. Daugherty represented to the court, the jury, and Ocwen's counsel that the financial exhibit supporting his punitive damages argument was that of Defendant Ocwen – not its parent, OFC:

- "I have the most recent filing with the SEC of **this defendant**, which shows the net worth or actual assets." (JA 3197) (emphasis added).

- Ms. Lyew was designated as the corporate designee regarding "the net worth of **this defendant** . . . In lieu of calling Ms. Lyew, I'm offering a public record that **Ocwen** filed with the Securities and Exchange Commission." (JA 3199-3200) (emphasis added).

- The award, if you decide that's appropriate, has to be enough to punish **this defendant**" . . . "**this** is a $7 billion corporation" and "[i]f you look at the second exhibit, the short exhibit, **this corporation** at the end of the first quarter of 2016 had $7.4 billion . . . [and] at the end of March 2016 **they** had "$280 million in cash on hand." (JA 3210) (emphasis added).

Daugherty's brazen denial of the truth should be condemned – not rewarded – and the punitive damages award stricken.

**D.    Ocwen is Entitled to Remittitur of the Constitutionally Excessive Punitive Damages Award**

The issue for this Court on remittitur is not whether the jury was justified in awarding punitive damages at all, but whether an award of $2.5 million is constitutionally excessive in light of the fact that Daugherty's actual damages were $6,000.  The evidence shows that only one of the five reprehensibility factors exists and that an award at the astounding ratio of 408:1 violates the Due Process Clause.

**1.    The *State Farm* Reprehensibility Factors do not Support a $2.5 million Punitive Damages Award.**

 Daugherty claims that the first, third and fourth factors identified by the Supreme Court in *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003) are present and justify a $2.5 million award.  Specifically, Daugherty contends that he suffered emotional distress, compounded by his financial vulnerability, which Ocwen allegedly made worse by its repeated conduct.  (Opp., 51-52.)  Neither the evidence nor the law supports his claims.

First, Daugherty misconstrues this Court's holding in *Saunders*, arguing that his emotional harm satisfies the first *State Farm* factor.  (Opp., 23.)  But in *Saunders*, this Court recognized that "FCRA violations result in economic and emotional harm, but such violations will very infrequently cause physical harm." *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 147 (4th Cir. 2008)

27

(the first and second factors will usually be absent); *see Bach v. First Union Nat'l Bank*, 486 F.3d 150, 154, 155 (6th Cir. 2007) (*Bach II*) (when defendant continues to report unfavorable credit information after receiving notification from plaintiff, defendant does not "not act with reckless disregard for the health and safety of others"). Despite the fact that emotional distress claims are common in FCRA actions, in *Saunders*, this Court recognized found the first factor *usually* absent. Thus, Saunders stands for the proposition that emotional distress does not satisfy the first factor. *See also Bach v. First Union Nat'l Bank*, 149 Fed. Appx. 354, 364 (6th Cir. 2005) (*Bach I*) (emotional distress is not the sort of physical injury *State Farm* contemplates).

Second, Ocwen's actions did not "make it more difficult for [Daugherty] to refinance his mortgage and remain in his house." (Opp., 52.) None of the facts supporting that finding in *Saunders* exist here. In *Saunders*, the evidence was that BB&T's refusal to report the account as disputed resulted directly in substantially lower credit scores. *Id.* at 153. Had BB&T reported the account as disputed, the debt would not have factored into his credit score. *Id.* In this case, the evidence was exactly the *opposite* – Ocwen reported the account as disputed and it did not affect Daugherty's Equifax credit score. (JA 2935-36.) Indeed, Daugherty's Equifax credit score was higher than his score with Experian. (JA 2963-69.)

28

Ocwen reported the account as disputed – thereby *reducing* the effect of Equifax's mistakes and making him *less vulnerable*, not more.

Finally, Daugherty points to Ocwen's supposed failure to investigate Daugherty's disputes 24 times. (Opp., 52.) But this argument blatantly misrepresents the evidence and ignores that the fourth factor requires "the similar reprehensible conduct be committed against various different parties rather than repeated reprehensible acts within the single transaction with the plaintiff." *Bach I*, 149 Fed. Appx., at 365 (citing *Gore*, 517 U.S. at 576-77 (the question is whether defendant's actions "formed part of a nationwide pattern of tortious conduct")). Thus, Ocwen's conduct with respect to Daugherty is not relevant to the fourth reprehensibility factor. Likewise, Ocwen's actions in *this case* cannot make it a "recidivist." Daugherty fails to cite any other case in which Ocwen's investigatory policies were found to violate the FCRA.

Even if Ocwen's actions here were relevant to this factor, the evidence refutes Daugherty's argument that Ocwen's policy was to conduct a data conformity review (merely comparing disputed ACDV fields to corresponding fields in the furnisher's monthly data). Nor does this case involve knowing misconduct as in *Saunders*, 526 F.3d at 151 (BB&T knowingly and intentionally

29

chose to report the debt without reporting the dispute).[10]  Daugherty concedes that 22 of Ocwen's 24 ACDV responses were appropriate, and the record proves the remaining two were not willful.  That is not the intentional or callous conduct required to justify $2.5 million in punitive damages.

### 2.    <u>A ratio of 408:1 is not justified.</u>

Daugherty insists that even a single reprehensibility factor can be sufficient to support an award of substantial punitive damages.  (Opp., 51, citing *Saunders*, 526 F.3d at 147 (citing *Bach II*, 486 F.3d at 155)).  But in *Bach I,* the Sixth Circuit held – where only one of the five reprehensibility factors was present – the "large punitive damages award" was *not* supported.  149 Fed. Appx. at 365.[11]  As a result, in *Bach II*, the Sixth Circuit *reduced* the $2.2 million award to $400,000 – a 1:1 ratio.  It is the reduced award that this Court identified as being "allowed," not the original $2.2 million award.  *Saunders*, 526 F.3d at 153.  Neither case stands for the proposition that a single factor can support a damages ratio of 408:1.

---

[10] Daugherty points to this Court's statement that intentional misconduct is more reprehensible than negligence or a mistake quickly corrected.  *Saunders*, 526 F.3d at 153.  But under the FCRA, the Court would not be considering the reprehensibility factors at all if the conduct were merely negligent or a "mistake." It defies logic to argue that the defendant's recklessness is relevant to reprehensibility in an FCRA case.

[11] Likewise, in *Bach II*, the Sixth Circuit held that "the absence of any of the other reprehensibility factors favored *reduction of the punitive damages award. Bach II*, 486 F.3d at 154, 155 (6th Cir. 2007) ("the absence of these factors substantially undercuts Bach's attempts to justify the size of the punitive damages award in this case.")

Moreover, with only one factor present – a punitive damages award must be reviewed with a "particularly critical eye." *Id.*

Daugherty contends that Ocwen's conduct was sufficiently egregious, and the actual damages sufficiently "nominal," that *Saunders* dictates throwing out a ratio-based analysis. (Opp., 54.) The cases Daugherty cites, however, do not help him. For instance, in *JCB v. Union Planters Bank*, 539 F.3d 862 (8th Cir. 2008), the court reduced the punitive damages award from $1.08 million to $108,000 based on constitutional concerns. In *Lee v. Edwards*, 101 F.3d 805 (2d Cir. 1996), the court vacated the punitive damages award and remanded for a new trial, unless plaintiff accepted a lesser award of $75,000 because the amount awarded solely for malicious prosecution exceeded the punitive damages awarded in similar, more severe cases. *Id.* at 811-13.

Similarly, in *Saunders*, this Court was persuaded that an 80:1 ratio was appropriate because the punitive damages award was relatively modest in comparison to awards in other FCRA cases. 526 F.3d at 154. That is not the case here, where the award is far from "modest" and the ratio is singularly excessive. Even the $3.3 million award involved in *Williams v. First Advantage LNS Screening Solutions, Inc.*, 2017 U.S. Dist. LEXIS 29688, *49 (N.D. Fla. March 2, 2017), involved a 13.2:1 ratio – not even close to 408:1. The court explained that there is good reason to permit higher ratios in background check cases where,

31

under a single digit ratio, the economic damages suffered by low wage employees would always result in minimal punitive damages. *Id.* at *49-50. That rationale does not apply here.

This is not a case involving high reprehensibility and only nominal damages, where a higher ratio is necessary to punish the defendant's conduct. Nor can OFC's financial position justify the award. For one thing, it is not *Ocwen's* financial situation. Further, the wealth of a defendant "cannot make up for the failure of other factors, such as 'reprehensibility' to constrain significantly an award that purports to punish a defendant's conduct." *State Farm*, 538 U.S., at 427-28 (citation omitted). In short, viewing the punitive damages with a critical eye, the award in this case unquestionably violates the Due Process Clause and must be substantially reduced.

## **CONCLUSION**

Ocwen respectfully requests that this Court reverse the District Court's rulings and grant summary judgment and/or judgment as a matter of law for Ocwen. Alternately, Ocwen requests that the Court strike the punitive damages award in its entirety, grant Ocwen a new trial, or remit the punitive damages award to a constitutional ratio of no more than 13:1.

Dated:  April 12, 2017                    Respectfully submitted,

                                                         TROUTMAN SANDERS LLP

                                                          */s/ Megan Burns*
                                                        MEGAN BURNS
                                                        JONATHAN M. KENNEY
                                                        JOHN C. LYNCH
                                                        JASON E. MANNING
                                                        TROUTMAN SANDERS, LLP
                                                        222 Central Park Avenue
                                                        Suite 2000
                                                        Virginia Beach, VA 23462
                                                        (757) 687-7500

                                                        Counsel for Appellant

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**
**Effective 12/01/2016**

No. ___16-2243___    **Caption:** David M. Daugherty v. Ocwen Loan Servicing, LLC

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

---

**Type-Volume Limit for Briefs:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

---

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

---

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

---

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[✓] this brief or other document contains ___6,999___ [*state number of*] words

[ ] this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[✓] this brief or other document has been prepared in a proportionally spaced typeface using
MS Word 2010 _____ [*identify word processing program*] in
Times New Roman, 14 point _____ [*identify font size and type style*]; **or**

[ ] this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s) Megan Burns _____

Party Name appellant _____

Dated: 4/12/2017 _____

# CERTIFICATE OF SERVICE

I certify that on <u>4/12/2017</u> the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

JED R. NOLAN
RALPH C. YOUNG
HAMILTON, BURGESS, YOUNG
& POLLARD, PLLC
P.O. Box 959
Fayetteville, NC 25840
(304) 574-2727

DEEPAK GUPTA
GUPTA WESSLER PLLC
1735 20th Street, NW
Washington DC 20009
(202) 888-1741

<u>/s/ Megan Burns</u>
Signature

<u>4/12/2017</u>
Date